Filed 3/1/18

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)       S104144
      v. )
)
JOSEPH ANDREW PEREZ, JR., )
)       Contra Costa County
      Defendant and Appellant. )       Super. Ct. No. 990453-3
_____)

In November 2001, Joseph Andrew Perez, Jr., was sentenced to death for killing Janet Daher during a March 1998 robbery at Daher's home. This is Perez's automatic appeal. Perez alleges several defects both at his jury trial and in California's administration of the death penalty. We affirm the judgment.

## I.

On March 24, 1998, Janet Daher was found dead in her home in Lafayette, California. An indictment filed in Contra Costa County Superior Court on March 24, 1999, charged Perez along with Lee Snyder and Maury O'Brien of four crimes related to Mrs. Daher's death: murder, residential robbery, residential burglary, and vehicle theft. The indictment charged special circumstances for the murder count under Penal Code section 190.2, subdivision (a)(17), alleging that Mrs. Daher was killed during the commission of a robbery and burglary.[1] The three cases were severed, and Snyder, who was 17 at the time of the crimes, was tried

---

[1] All subsequent unlabeled statutory references are to the Penal Code.

1

first.  (See *People v. Snyder* (2003) 112 Cal.App.4th 1200, 1206, 1216.)  He was convicted of all four charges and sentenced to life in prison without the possibility of parole, plus six years.  (*Ibid.*)  Jury selection for Perez's trial started on September 12, 2001, and testimony began on September 24.  O'Brien had not been tried when Perez's trial began.

The trial's first witnesses described how the victim's body was discovered.  The victim's husband, Joe Daher, testified that he left home for his daughter Lauren's softball game around 2:00 p.m. on the day of Mrs. Daher's death.  Mrs. Daher was home at the time, and Mr. Daher left the garage door open.  According to Mr. Daher's testimony, he answered a phone call from his other daughter Annie on his way home from the game.  Annie had come home from school to find her mother missing and the contents of her mother's purse strewn on the floor.  Annie did not go upstairs to the master bedroom, and she eventually called law enforcement.  The dispatcher told her that officers had found her mother's vehicle and that officers were on their way to the house.  Two officers arrived and one went upstairs.  He testified that he found Mrs. Daher's body on the floor of the master bedroom with a phone cord tied "very tightly around her hands" "up to her neck, around her neck."  Mr. Daher later helped officers identify the property that was missing from the house, including his wife's sport utility vehicle (SUV) and several thousands of dollars' worth of jewelry.

Law enforcement officers soon began recovering some of the stolen property and identifying suspects.  Multiple witnesses told officers that they saw three men near the Daher home on the afternoon of the murder.  One of these witnesses testified that he drove within 25 feet of the men and then identified Perez in court.  Another witness identified Perez in a photo lineup.  Asked in court if Perez was who he saw and identified, the witness testified that he "can't be exact, but yes, he looks a lot like him."  Mrs. Daher's SUV was discovered in the

2

yard of a roofing company in Cordelia, a small town near Fairfield. An employee of the roofing company testified that he found the SUV "up against the fence like somebody was trying to hide it." A detective also testified that he had found records showing that Maury O'Brien checked into the Overnighter Motel (less than a half mile from where the SUV was found) on March 24, 1998. The owner of the motel later testified that O'Brien had registered at the motel at 3:31 p.m. on March 24.

Officers tracked O'Brien down about a month and a half after the murder, after the Contra Costa County Sheriff received a tip. The tip eventually led officers to Lacy Harpe, O'Brien's former girlfriend, who told the officers that O'Brien may have been involved with the crime. At first O'Brien denied his involvement in the crime, but the officers told him they had evidence against him. O'Brien then quickly admitted that he was involved in the crime, though he insisted that he did not personally harm Mrs. Daher. O'Brien testified against Perez at trial, describing how the men came to break into the Daher home and kill Mrs. Daher. He testified that he and Lee Snyder were plotting to rob a drug dealer and discussed the plan with their friend Jason Hart, who introduced the two to Perez. O'Brien told jurors that he met with Perez every day in the two or three days before the murder. O'Brien was not planning for the robbery of the drug dealer to take place on March 24, but Perez "showed up unexpectedly" that morning so the men agreed to do it that day. They arranged to meet the drug dealer in Fairfield and decided to take the Bay Area Rapid Transit (BART).

According to the testimony, the men boarded BART at the Balboa Park station in San Francisco. They planned to get off in either Pleasant Hill or Walnut Creek, but their plans changed. Instead the men debarked the train at the Orinda station to smoke cigarettes. O'Brien testified that Snyder and Perez "were looking out into the hills over there between Orinda and Lafayette" and decided that they

3

"wanted to rob a house instead of going up to Fairfield." The men walked a short distance to some nearby large houses, and began searching for "whatever one would be easiest to break into." O'Brien was carrying a knife, Snyder had a handgun, and Perez was unarmed. The group saw a house with its garage door open. The three went inside, and Perez closed the garage door. They saw Mrs. Daher as soon as they entered the house. O'Brien testified that Perez "put his hand over her mouth and hit her on the head, and she went down to the floor." O'Brien then "held the gun on her" as "[Snyder] went . . . through the downstairs rooms and [Perez] went through the upstairs rooms." Mrs. Daher told O'Brien that her daughter "was coming home in 15 minutes," so O'Brien "yelled out to [Perez] and [Snyder] that we had 15 minutes to get in and out." O'Brien may have used their names when he yelled this, and Perez responded that O'Brien "would have to kill the victim" since he "spoke up and messed it all up."

O'Brien also testified that Mrs. Daher "was very cooperative" throughout the robbery. Snyder and Perez took Mrs. Daher upstairs. O'Brien testified that he heard noises from upstairs, so he went up to the master bedroom, where he saw Snyder "pulling out a telephone cord" and Perez "on the other side of the bed" "maybe holding the victim down." He later saw "Perez on top of the victim" with "the telephone cord wrapped around [her]." Perez "was pulling really hard on the telephone cord" and Mrs. Daher's "neck was twisted back." O'Brien testified that Perez told him "to go get a knife from the kitchen," so O'Brien handed over the knife that was in his pocket. Mrs. Daher was "lying motionless face down by her bed" as Perez walked over and stabbed her "many times" with the knife "[a]ll over her body and her head and neck area." Perez later handed O'Brien his knife back.

The men found Mrs. Daher's SUV in the garage with the keys inside. Perez drove. The men drove toward Fairfield but then abandoned the vehicle and checked into the Overnighter Motel in Cordelia, where they split the stolen

4

property. O'Brien cleaned the knife in the bathroom and later threw it in some bushes. They then went to the home of an acquaintance named Justin Mabra, where they did cocaine with Mabra and his girlfriend Megan McPhee. Soon their friend Jason Hart (the one who had introduced O'Brien and Snyder to Perez) picked the three of them up in his car. In the car with Hart was Deshawn Dawson. Hart drove the men to Snyder's home in San Francisco.

Mabra, McPhee, Dawson, and Hart all testified against Perez as well, corroborating several aspects of O'Brien's narrative. Mabra testified that he and McPhee encountered Perez, O'Brien, and Snyder in Fairfield in late March 1998, around the time of the murder. Mabra did not know Perez from before but identified him both at a live lineup and in court. McPhee also identified Perez both in a live lineup and in court. Dawson testified that he was in the car when Hart drove the men to San Francisco. Dawson told jurors that the three were "talking and bragging" about "stealing and robbing and whatnot."

Hart began his testimony by telling jurors that he had been granted immunity from prosecution. He testified that O'Brien and Snyder had told him about their plan to rob a drug dealer, and Perez wanted to join because "he was broke and he needed some money." Perez later told him that "they robbed a lady" and strangled her to death with a phone cord. Hart drove the three men to Snyder's home, where they showed Hart the jewelry they had stolen. Hart was especially interested in buying a large diamond ring that Snyder was carrying, but Snyder wanted a thousand dollars for it. Hart ended up paying $200 for a diamond ring from Perez. When officers arrested Snyder, they found him carrying a gold necklace and several rings that the Daher family identified as belonging to them. The same day, officers searched Snyder's home and found property from the Daher home, including more jewelry and a mobile phone.

5

The prosecution also called two witnesses to describe Mrs. Daher's autopsy. The first was Steven Ojena, a criminalist who worked at the Contra Costa County Sheriff's crime laboratory. During the autopsy, Ojena could see the telephone cord "stretched tightly around her neck" and "wrapped around her wrists," "binding her hands behind her back." He also testified that Mrs. Daher had "ligature marks, that is, impression marks on her neck," and he took photographs of the body during the autopsy. Next was Brian Peterson, a forensic pathologist who worked for a private company in Fairfield that had a contract with Contra Costa County to perform autopsies. Another pathologist from the company had performed Mrs. Daher's autopsy, but she had since left the company. Peterson described the autopsy findings and testified to his opinion about the cause of death.

The defense only called two witnesses in the guilt phase. First, Lacy Harpe, O'Brien's former girlfriend, testified that O'Brien had spoken to her about the murder before he was arrested. O'Brien had given her some jewelry, and she explained that he told her at some point that "him and [Snyder] and this other guy went . . . inside this lady's garage that was open and into the house and killed her for her car and $20 and broke her neck." Second, Ken Whitlatch (one of the two officers who came to the Daher home and met Annie) testified that he interviewed one of the eyewitnesses who had seen the three men walking in the neighborhood. The parties then stipulated that the eyewitness drew for Officer Whitlatch a picture of the tattoo he saw on the right side of Perez's neck.

The jury found Perez guilty on all four charged counts. The penalty phase began a week later. The prosecution presented evidence of several uncharged prior crimes: a 1992 mugging, a rape of a minor from 1992 or 1993, an assault from 1994, and some violent incidents from when Perez was incarcerated. The prosecution also called Mrs. Daher's two daughters, who described how Mrs.

6

Daher's death had impacted their lives. The defense's penalty-phase case consisted of rebuttal testimony about the uncharged prior crimes, as well as mitigating evidence from over a dozen witnesses who had known Perez at different times in his life. The witnesses chronicled how Perez's teenaged parents abused and neglected him, as well as how Perez had from a young age been surrounded by drugs and violent crime. His parents sold and used drugs in front of him. Perez's father would sometimes blow marijuana smoke into Perez's face when he was a baby, and he was taught how to smoke a marijuana joint when he was a toddler. Perez attended four different schools from kindergarten through first grade, and his numerous absences from school forced him to repeat the first grade. As a teenager, Perez served as a lookout while his father committed burglaries and other crimes, often stealing money to buy drugs. When Perez was nine, his mother was living with a man who sold drugs from his home. Perez spent a night at the house when two armed men broke in, demanding money and drugs. The men tied up Perez and his mother, threatening to shoot Perez in the head.

Perez later experienced more stability living with his grandmother, but she died of a stroke when Perez was 12. Perez soon began committing crimes and went in and out of foster care, youth homes, and work camps before he was committed at age 14 to the California Youth Authority (CYA). Perez was one of the youngest wards in the CYA system at the time. The defense presented testimony from an expert on juvenile detention facilities, who described violence, abuse, and chaos in CYA facilities during this period. The jury also heard from a psychologist who characterized Perez's childhood as "remarkably unstable" and "overwhelmed with chaos, violence, and loss." She explained that "dissocial behavior was the norm" in Perez's family. The state's rebuttal evidence consisted of new testimony on the uncharged prior crimes.

7

The jury returned a verdict of death on November 16, 2001.  After defense counsel moved to modify the sentence, the trial court ruled that the aggravating factors outweighed the mitigating ones and the defendant had shown "no sense of wrongdoing or remorse."  The court sentenced Perez to death for the murder count, as well as six years for burglary, four years for robbery, and two years for vehicle theft.

## II.

### A. Pretrial issues

#### 1.  Counsel's conflict of interest

Perez claims his lead attorney, William Egan, Jr., faced a conflict of interest because Egan had a few years earlier represented a client named Yvonne Eldridge in a criminal trial before Perez's trial judge, Judge Peter Spinetta.  Judge Spinetta ruled in the *Eldridge* case that Egan rendered ineffective assistance of counsel to Eldridge.  Perez's case was assigned to Judge Spinetta on November 5, 1999.  An appeal of Judge Spinetta's ineffectiveness ruling in Eldridge's case was pending in the Court of Appeal at that time.  Then, several months before Perez's trial began, the Court of Appeal remanded Eldridge's case for further factual findings.  Judge Spinetta held an evidentiary hearing and then ruled again that Egan had been ineffective at Eldridge's trial.  The appeal of this ruling was pending throughout Perez's trial.  If the Court of Appeal upheld Judge Spinetta's ruling, the judge may have had to file a report with the state bar detailing Egan's conduct in Eldridge's case.  (See Bus. & Prof. Code, § 6086.7, subd. (a)(2).)  Perez argues that this ongoing connection between Egan and Judge Spinetta established a conflict of interest because Egan's "overriding concern would have been in controlling and limiting the damage already done to his relationship with the trial judge, not in vigorously defending his client."

8

*a) Background*

The same day that Perez's case was assigned to Judge Spinetta, on November 5, 1999, the judge met with Egan to discuss the case. This meeting was transcribed into the trial record, though Perez was not present. Counsel for co-defendant Lee Snyder was not present either, nor was any prosecutor present. Egan and Judge Spinetta discussed whether the assignment of the case to the judge was appropriate in light of the judge's ruling that Egan had been ineffective at Yvonne Eldridge's trial. Egan shared that he found out about Judge Spinetta's ruling in Eldridge's case after a reporter called him. Egan also said that the "whole thing is definitely the worst thing that's ever happened to me in my career." Judge Spinetta expressed sympathy and told Egan that the pending appeal in Eldridge's case would have "absolutely no impact" on his attitude toward Egan at Perez's trial.

Throughout the conversation, Egan repeatedly stated that he preferred for Perez to be tried before Judge Spinetta. He explained that "the whole reason" he wanted to meet with the judge to discuss the issue at this early stage is that he did not want the case transferred to another judge. Egan explained that his "objective is to end up being comfortable trying the case in this court." He added: "I want to be in this court and I want to clear the air on it." The judge suggested that Egan discuss the issue with his client. Egan implied he would and then reiterated: "[M]y desire, whether or not it has any bearing or anything, is to have the case stay here." The judge concluded by observing that "we need the client and the D.A. here," lest someone in the future alleges that the case "shouldn't have proceeded in that department, given the situation that Mr. Egan and Judge Spinetta were in at that time because of the Eldridge conflict."

A few days later, on November 10, 1999, Judge Spinetta met again with Egan, this time with counsel for co-defendant Snyder also present (the trials had

9

not yet been severed). Perez was not present at this meeting, nor was any prosecutor. Judge Spinetta observed that if the Court of Appeal upheld his determination that Egan was ineffective at Eldridge's trial then "I may have to report it, and there may be an investigation in the matter." The judge reiterated though that this possibility would not affect his attitude toward Perez's trial. He also observed that he was not putting Egan "in any conflict situation" because "the only thing that [Egan] could do to impress me in connection with [Perez's trial] would be the sort of thing that's consistent with the interest of your clients. And that is effective representation of your current client." Egan responded that he did not think he had been placed "in a conflict situation." The transcript does not appear to indicate if Judge Spinetta ever asked Egan if he had discussed the issue with Perez since the last meeting, and Egan did not say anything about this question on the record.

Judge Spinetta referred throughout this second meeting to the possibility of Egan or Perez filing a Code of Civil Procedure section 170.6 motion against the judge. Section 170.6 provides that "[a] judge . . . shall not try a civil or criminal action . . . when it is established as provided in this section that the judge . . . is prejudiced against a party or attorney or the interest of a party or attorney appearing in the action or proceeding." (Code Civ. Proc., § 170.6, subd. (a)(1).) Prejudice for purposes of section 170.6 is established by a motion supported by an "affidavit or declaration under penalty of perjury, or an oral statement under oath" that the assigned judge "is prejudiced against a party or attorney . . . so that the party or attorney cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judge." (*Id.*, subd. (a)(2).) So long as the "motion is duly presented, and the affidavit or declaration under penalty of perjury is duly filed or an oral statement under oath is duly made, thereupon and without

10

any further act or proof," section 170.6 requires for a different judge to be assigned. (*Id.*, subd. (a)(4).)

Judge Spinetta made several references to Code of Civil Procedure section 170.6 throughout his second meeting with Egan. The judge began the meeting by noting that the "first" issue that needed to be discussed "is really a nonissue, and that is whether [Perez] should exercise a 170.6 in this matter, for any reason." He explained that the question of whether Perez or Egan should file a section 170.6 motion was "of course, for you and your client to decide" and "I don't really get involved in that one way or another." The judge then turned the conversation to whether his potential obligations with regards to the Eldridge case created a conflict of interest. But some time later, the judge again brought up section 170.6, suggesting that the discussion the two men had been having about the potential conflict "is separate from the 170.6." Egan responded, "Right." The judge then reiterated at length that he did not want to discuss the topic of section 170.6: "I don't really want to comment too much about the 170.6, other than to say that's clearly simply for you and your client to decide, or you and your client, for that matter, for other reasons. And I really should not talk about that. Because, quite frankly, I don't want any appearance that I'm addressing those matters. Those are not proper matters, I don't think, for counsel and court to talk about. Those are things for you guys to decide. You have a statutory right, and judges understand that. There's a right to do those things, and there's no problem one way or the other, insofar as anybody's concerned — so far as I'm concerned."

In April 2000 — five months after Perez's case was assigned to Judge Spinetta and long before Perez's trial began in September 2001 — the Court of Appeal issued an unpublished opinion reversing Judge Spinetta's ineffective assistance ruling and remanding the case for new factual findings. Judge Spinetta then held an evidentiary hearing in September 2000. Egan testified at the hearing,

11

explaining the choices he made while representing Eldridge.  In December 2000, Judge Spinetta again ruled that Egan had been ineffective in representing Eldridge. The judge characterized Egan's choices in the case as "disastrous" and explained that Egan left the "case seriously wanting of any evidence likely to move the jurors."  The People appealed again.  The Court of Appeal did not rule the second time around until September 2002, nearly a year after Perez's trial was completed. This time, the court affirmed Judge Spinetta's judgment in full.

*b) Analysis*

Both the United States Constitution and the California Constitution guarantee criminal defendants the right to the assistance of counsel unburdened by any conflicts of interest.  (See *People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)  Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel.  (*Ibid.*; *People v. Mai* (2013) 57 Cal.4th 986, 1009-1010 ["[A] claim of conflicted representation is one variety of claim that counsel provided ineffective assistance."]; *Doolin,* at p. 419 ["Under our state Constitution, the right to counsel includes the correlative right to conflict-free representation."].)  In order to demonstrate a violation of the federal and state constitutions based on a conflict of interest, a defendant must show that his or her counsel was burdened by an "actual" conflict of interest — one that in fact adversely affected counsel's performance.  (*Doolin*, at p. 421 ["[T]he high court's analysis of Sixth Amendment conflict of interest claims has evolved into one of ineffective assistance of counsel, which requires a defendant to show counsel's deficient performance and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different."].)  When determining whether counsel's performance was "adversely affected" by the purported conflict under this standard, we consider whether " 'counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he

12

might have, had there been no conflict.' " (*Id.* at p. 418.) This analysis will often turn on choices that a lawyer could have made, but did not make. In order to determine whether those choices resulted from the alleged conflict of interest, we must analyze the record to determine whether a lawyer who did not face the same conflict would have made different choices as well as whether counsel's choices were the product of tactical reasons rather than the alleged conflict of interest. (See *ibid.* [" '[W]here a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citations.]"].)

In his opening brief, Perez contends that Egan's loyalty was divided between Perez's interests and Egan's personal interest in currying favor with Judge Spinetta. Specifically, Perez argues that because "Mr. Egan was 'intending to retire' after this trial, his overriding concern would have been to go out with a clear record." To accomplish this task, Perez asserts that Egan "would be unlikely to do anything at appellant's trial which could cause Judge Spinetta to cast him in an unfavorable light with regard to the state bar." Perez also argues that "Egan's overriding concern would have been in controlling and limiting the damage already done to his relationship with the trial judge, not in vigorously defending his client."

Although Perez identifies these purported conflicts of interest in his opening brief, Perez fails to specify how Egan's divided loyalties affected the defense. Perez's reply brief then adds a list of specific actions he claims Egan would have taken if Egan was not burdened by a conflict of interest. What none of the examples establish is that Egan was burdened by an actual conflict of

13

interest that adversely affected Perez's defense. Perez first points to ways in which Egan could have presented a stronger guilt phase case. He observes that Egan "called only two witnesses" during the guilt phase and "made little effort to discredit [prosecution witnesses] or point out numerous inconsistencies in their testimony." Perez presents no explanation for how the purported conflict — Egan's supposed desire to prove that he did not deserve state bar discipline for providing ineffective assistance to another client — could possibly motivate Egan to provide *weaker* assistance of counsel to Perez. If anything, that desire might have motivated Egan to provide Perez more effective counsel. Because the record contains nothing that links Egan's choices to the alleged conflict, Perez has not established "that the conflict of interest adversely affected his counsel's performance." (*Mickens v. Taylor* (2002) 535 U.S. 162, 174.) Perez may end up introducing new evidence in post-conviction proceedings that link Egan's choices to the alleged conflict of interest. But on the record before us at this time, we have no basis to "conclude that the only explanation for counsel's failure to" call additional witnesses and discredit the prosecution's evidence more vigorously "is the asserted conflict of interest." (*Doolin*, *supra*, 45 Cal.4th at p. 423.)

Although some of Egan's choices in the case may at least arguably appear consistent with the goal of remaining in the judge's good graces, alternative — and legally permissible — rationales are also consistent with Egan's behavior. Even if we assume Egan faced incentives to alter his behavior to remain in the judge's good graces, the question remains whether such incentives created a conflict of interest that adversely affected counsel's performance. To answer that question, we must " 'examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.'

14

[Citation.]" (*Doolin*, *supra*, 45 Cal.4th at p. 418.) The record before us at this time does not establish that any of Egan's choices were attributable to a conflict of interest. Nothing in the trial record addresses whether a different attorney would have made other choices or whether tactical considerations informed Egan's decisions. For example, for Egan's failure to file a Code of Civil Procedure section 170.6 motion, the record at this time does not even contain evidence establishing that either Egan or Perez "believe[d]" that Perez would not "have a fair and impartial trial . . . before the judge" as would have been required for the affidavit supporting the motion. (Code Civ. Proc., § 170.6, subd. (a)(2).) Because "[t]he record does not show that a different strategy would likely have been adopted by competent, unconflicted counsel," "it fails to demonstrate either conflict-driven adverse performance, or ineffective assistance, on counsel's part." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1014; see also *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 310 [rejecting claims that a purported conflict of interest caused counsel to perform adversely because the "contentions reflect pure speculation, unsupported by anything in the record"].) Perez fails to establish that any "conflict of interest adversely affected his counsel's performance," thus his claim must be denied. (*People v. Mickens*, *supra*, 535 U.S. at p. 174.)

     *2. Perez's absence during discussions on Egan's conflict of interest*

     Perez argues that the trial court violated his federal and state constitutional right to be present at judicial proceedings critical to the outcome of his case, because Perez was absent at the November 5, 1999, and November 10, 1999, discussions about Egan's supposed conflict of interest, discussed in detail in the prior section. A criminal defendant has the right under the Sixth Amendment and the due process clause to be " 'present at any stage of the criminal proceedings "that is critical to its outcome if his presence would contribute to the fairness of

15

the procedure.' ' " (*People v. Perry* (2006) 38 Cal.4th 302, 311 (*Perry*).) Our state Constitution similarly provides a " 'right to be personally present at critical proceedings.' " (*Ibid.*) In contrast, a defendant has no right to be present at discussions on questions of law outside the jury's presence or at proceedings where the defendant's presence does not have a " ' " 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' " ' [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1357 (*Bradford*).) Although the exclusion of the defendant from a critical proceeding constitutes error, it is not structural error. (*People v. Mendoza* (2016) 62 Cal.4th 856, 901 ["The high court has never suggested that a defendant's improper absence from any critical stage of the proceedings constitutes structural error requiring reversal without regard to prejudice."].) Instead, we evaluate federal constitutional error for harmlessness under the *Chapman* beyond a reasonable doubt standard, and state law error under the *Watson* reasonably probable standard. (*Id.* at pp. 901-902; *Chapman v. California* (1967) 386 U.S. 18, 24 [requiring error to be harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [finding prejudice unless it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"]; see also *Perry*, at p. 312; *Bradford*, at p. 1357.)

Perez contends that the November 5 and November 10 discussions were critical stages of the proceedings — and that Perez's presence would have contributed to the fairness of those proceedings. We have previously acknowledged that a criminal defendant "may be entitled to be present at a conference called to consider whether to remove his counsel for conflict of interest or any other reason." (*Perry*, *supra*, 38 Cal.4th at p. 313.) Nonetheless, we need not resolve whether Perez's absence here constituted a violation of his

16

constitutional right to be present because any such error was harmless beyond a reasonable doubt.

What Perez argues is that he suffered prejudice because his presence at the November 5 and November 10 discussions would have enabled him to seek removal of either his attorney because of a conflict of interest, or Judge Spinetta by making a motion under Code of Civil Procedure section 170.6. Yet no prejudice arises from Perez's alleged lost opportunity to remove his attorney. A review of the circumstances associated with the proceeding in Perez's case shows why. During the discussions on the conflict of interest issue, Judge Spinetta clearly stated that he was not putting Egan "in any conflict situation" because "the only thing that [Egan] could do to impress me in connection with [Perez's trial] would be the sort of thing that's consistent with the interest of your clients. And that is effective representation of your current client." Moreover, approximately one year later, Perez brought a motion under *People v. Marsden* (1970) 2 Cal.3d 118 to remove his counsel. That motion raised Judge Spinetta's prior finding that Egan provided ineffective assistance of counsel in the *Eldridge* case. But Judge Spinetta found no conflict of interest and stated that "there was nothing [in the *Marsden* proceedings] that made it appear to the court that Mr. Egan might be in some conflict of interest situation warranting the appointment of another counsel to address issues of ineffective assistance of counsel." From this record, we can glean that even if Perez had been present at the November 5 and November 10 discussions and sought to remove his counsel based on a conflict of interest, the trial court would have denied such a motion. We hold above that Perez fails to demonstrate that his counsel had an actual conflict of interest. Accordingly, Perez's purported lost chance to seek to remove his attorney does not constitute prejudice.

17

Perez also contends that if he had been present at the November 5 and November 10 discussions, he might have "exercise[d] a peremptory challenge" under Code of Civil Procedure section 170.6. Section 170.6 allows a defendant to bring a motion — supported by an affidavit or declaration — alleging that the assigned judge "is prejudiced against a party or attorney" such that the party or attorney "cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judge." (Code Civ. Proc., § 170.6, subd. (a)(1), (2).) So long as the requirements for filing such a motion are followed, section 170.6 requires a different judge to be assigned in lieu of the originally assigned one. (*Id.*, subd. (a)(4).) According to Perez, had he been present at the November 5 and November 10 discussions, he would have learned of the conflict of interest issue and might have filed a section 170.6 motion. But irrespective of Perez's presence at the proceedings, Egan was under an obligation to raise these issues with Perez. (See Rules Prof. Conduct, rule 3-500 ["A member shall keep a client reasonably informed about significant developments relating to the employment or representation."]; ABA Model Rules Prof. Conduct, rule 1.4(b) ["A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."].) Indeed, Judge Spinetta urged Egan to consult with Perez multiple times about whether Perez wished to file a section 170.6 motion. During the discussion on November 10, for example, Judge Spinetta stated the following: "I don't really want to comment too much about the 170.6. . . . Those are not proper matters, I don't think, for counsel and court to talk about. Those are things for you guys to decide." Perez argues in his supplemental briefing that "there is nothing in the record to indicate appellant was made *aware* of defense counsel's concern over the fairness of Judge Spinetta or Judge Spinetta's concern over counsel's potential conflict." Nonetheless, just because the limited record on a direct appeal was devoid of such information does

18

not mean that Perez lacked knowledge of the alleged conflict of interest. And even if Perez had been present, we do not know whether he would have filed a section 170.6 motion.

Indeed, even now Perez only states it is "reasonably possible that he would have insisted that Judge Spinetta be recused" — and does not state that he *would* have filed a Code of Civil Procedure section 170.6 motion. Because the discussion between the trial court and Egan resulted in the conclusion that no conflict of interest existed, it is unclear why Perez would have developed a sufficient belief of Judge Spinetta's prejudice to file a section 170.6 motion. Indeed, such a motion requires a sworn statement, under penalty of perjury, that Perez believed the judge to be prejudiced. So we have no basis to conclude that Perez suffered prejudice in this direct appeal. (Cf. *People v. Davis* (2005) 36 Cal.4th 510, 533 [holding lack of presence harmless where counsel had "ample opportunity to discuss" the defendant's thoughts before a hearing and that "there is no way on this record to determine, had defendant been present at the hearing," what information the defendant would have provided].)

Nor are we persuaded Perez suffered prejudice because he lost the opportunity to replace Judge Spinetta. (See *People v. Lee* (2002) 95 Cal.App.4th 772, 780 ["[D]efendant cannot show prejudice. . . . He has not shown the loss of his [Code of Civil Procedure section] 170.6 motion deprived him of a defense nor has he submitted even one example of prejudicial treatment by [the presiding judge]."]; *In re James H.* (1981) 121 Cal.App.3d 268, 273 ["His defense was one of alibi, and it was fully presented by himself, his mother and stepfather. . . . Under the circumstances of this case, the failure to properly invoke the Code of Civil Procedure section 170.6 challenge was not prejudicial . . . ."].) Perez does not point to any action or decision by Judge Spinetta that shows prejudice, or that shows that the outcome would have changed if some other judge had presided

19

over the proceedings. (See *Bradford*, *supra*, 15 Cal.4th at p. 1358 ["[D]efendant has failed to explain how his attendance during the testimony of these witnesses would have altered the outcome of his trial . . . ."].) And as detailed below, we reject Perez's contentions that Judge Spinetta was biased. Accordingly, if any constitutional error resulted from Perez's absence from the November 5 and November 10 discussions, it was harmless beyond a reasonable doubt.

### 3. *Trial judge's disqualification*

Later during pretrial proceedings, Perez moved to disqualify Judge Spinetta under Code of Civil Procedure section 170.1 based on statements the judge made at co-defendant Lee Snyder's trial. The motion was denied by a separate judge assigned to adjudicate it. Perez claims this was an error. Several months before Perez's trial began, Snyder was found guilty at a jury trial before Judge Spinetta. In March 2001, about six months prior to the start of Perez's trial, Judge Spinetta denied Snyder's motion for a new trial. While announcing that ruling, the judge made several statements about the strength of the prosecution's evidence. Some of this same evidence would later be used against Perez too. Judge Spinetta first stated that he was "persuaded" that "Mr. O'Brien was telling the truth in all material regards." He also said that the evidence to support the verdict was "substantial." Later, when sentencing Snyder, Judge Spinetta characterized the murder as "senseless," "vicious," "heinous," "done with premeditation," "cold," "callous," "perpetuated by what [were] clearly indifferent murderers," and "horrendous." The judge further stated that "the evidence strongly points to the fact that Mrs. Daher was dead at the time she was stabbed."

Within weeks of Snyder's sentencing, Perez filed a motion to disqualify Judge Spinetta. Attached to the motion were newspaper stories about Snyder's sentencing hearing. One story reported that "Spinetta disagreed" with the Snyder

family's claims of innocence, "saying the evidence supported a conviction." The story also referred to Judge Spinetta saying that "O'Brien told the truth about the material facts." Another story observed that the judge "[b]rush[ed] aside a claim of innocence." Perez's motion to disqualify was assigned to a separate judge. Judge Spinetta filed a written response explaining that the "import" of his remarks was that he found O'Brien's testimony "at the *Snyder* trial to be credible, in the light of the cross-examination, and the evidence presented, there." Judge Spinetta also said he did "not consider [him]self precluded in any way from coming to a different judgment if warranted by the evidence at the *Perez* trial."

This court long ago explained that a trial judge may hear a case even if he or she has expressed an adverse impression of a party that was "based upon actual observance of the witnesses and the evidence given during the trial of an action." (*Kreling v. Superior Court* (1944) 25 Cal.2d 305, 312; see also *ibid.* ["[W]hen the state of mind of the trial judge appears to be adverse to one of the parties but is based upon actual observance of the witnesses and the evidence given during the trial of an action, it does not amount to that prejudice against a litigant which disqualifies him . . . ."]; *In re Richard W.* (1979) 91 Cal.App.3d 960, 968 ["A judge is not disqualified to try a case merely because he previously, in a separate proceeding, heard a case of a coparticipant or passed on the application of a codefendant for probation. [Citations.]"].) Though a judge in certain circumstances may develop an excessive or improper bias against a defendant because of evidence about the defendant presented in another case, Judge Spinetta's comments at Snyder's trial suggest no such bias. The judge simply stated that he found the live testimony and other evidence against Snyder to be sufficiently persuasive. Not once did the judge refer to any evidence or information beyond what those trial witnesses elucidated through their testimony. Nor did the judge's comments go beyond the two narrow questions he was tasked

21

with answering: whether the evidence was sufficient to establish guilt and what penalty suited the crime. While there may have been some risk that the jurors at Perez's trial would have read media reports about Judge Spinetta's assessment of the evidence at Snyder's trial, the proper way to alleviate this concern was via jury selection, not disqualification of the judge. Perez has not proven that Judge Spinetta's comments at Snyder's trial served to disqualify him from presiding over Perez's trial.

### 4. *September 11*

Jury selection in Perez's trial began one day after the September 11 terrorist attacks. He claims that the "intense pro-government patriotic fervor generated by this traumatic event meant that the defense was operating under a tremendous disadvantage both in attempting to discredit the State's case for appellant's guilt and in opposing the State's request for the death penalty." Yet Perez offers no examples of how the September 11 attacks biased jurors, and his trial did not raise any issues that resembled any issues related to the attacks. Other courts have rejected similarly generalized claims about prejudice from the September 11 terrorist attacks. (See, e.g., *U.S. v. Templeton* (8th Cir. 2014) 378 F.3d 845, 848, fn. 2; *U.S. v. Capelton* (1st Cir. 2003) 350 F.3d 231, 236-237; *U.S. v. Merlino* (D.Mass. 2002) 204 F.Supp.2d 83, 89-90, affd. in part & revd. in part on other grounds (1st Cir.) 592 F.3d 22.) Moreover, though Perez argues that his trial "should have been continued," the record does not indicate that he asked for a continuance. Perez fails to establish that his trial's timing improperly biased his jurors or otherwise violated his constitutional rights.

## B. Jury selection claims

### 1. Restrictions on voir dire

Perez contends that "the trial court's jury selection system did not allow adequate time for *voir dire* of the prospective jurors." The trial court had denied defense counsel's request to sequester potential jurors from each other for a portion of voir dire. The trial court also restricted each side's questioning of potential jurors to a half-hour per panel of 25 jurors. Perez argues that these restrictions prevented his lawyers from asking potential jurors about discrepancies between their written questionnaires and live answers. He also argues that potential jurors may have become "less inclined to rely upon their [] impartial attitudes about the death penalty" after they saw others get dismissed for stating opposition to the death penalty, as well as that jurors might "mimic responses that appear to please the court." Perez also points to instances where potential jurors heard details about the case from fellow panelists, such as when one potential juror said she wanted the defendants "killed like they killed her." Another panelist said he would "adamantly press for the death penalty" based on what he learned about the case from media reports.

We have long recognized that "the enormity of the jury's decision to take or spare a life" requires trial judges to "be especially vigilant to safeguard the neutrality, diversity and integrity of the jury." (*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 81.) At the same time, "in reviewing a trial court's denial of a defendant's motion for individual sequestered jury selection, we apply the 'abuse of discretion standard,' under which the pertinent inquiry is whether the court's ruling 'falls outside the bounds of reason.' [Citation.]" (*People v. Famalaro* (2011) 52 Cal.4th 1, 34.) In *Famalaro*, prospective jurors had commented in front of their peers that the "defendant should 'fry,' and that they felt uncomfortable looking at, and breathing the same air as, [him]." (*Ibid.*) Other jurors revealed

23

that they "had prejudged defendant's guilt and believed he should be executed." (*Id.* at p. 35.)  Yet we found no error or prejudice in the trial judge's decisions to allow group voir dire, explaining that "[i]ndividual sequestered jury selection is not constitutionally required, and jury selection is to take place 'where practicable . . . in the presence of the other jurors in all criminal cases, including death penalty cases.' " (*Id.* at p. 34, quoting Code Civ. Proc., § 223.)  In Perez's case, as in *Famalaro*, the trial court acted within its discretion when it chose to allow group voir dire despite statements from some jurors that they had views on the case.

As for Perez's argument that the trial court gave counsel too little time to question each juror, neither the state nor federal Constitution requires individualized voir dire questioning by attorneys.  (See *People v. Avila* (2006) 38 Cal.4th 491, 533-536; see also *Morgan v. Illinois* (1992) 504 U.S. 719, 729-730.) As for statutory requirements, the Legislature has established only that "counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors" after "completion of the court's initial examination." (Code Civ. Proc., former § 223.)[2]  Former section 223 also says that the trial court "may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors," including by "specify[ing] the maximum amount of time that counsel for each party may question an individual juror" or by "specify[ing] an aggregate amount of time for each party." (*Ibid.*)  We have further recognized that trial judges have "a duty to restrict voir dire within

***

[2]    Former Code of Civil Procedure section 223 was repealed by Stats. 2017, c. 302 in September 2017, and the new section 223 became effective as of January 1, 2018. (See Code Civ. Proc., § 223.)  We refer to former section 223 because it was the requirement in effect at the time of the voir dire for Perez's trial.  Even if we were to apply the new section 223, the result would not change because setting "reasonable limits" to attorney voir dire is still "in the judge's sound discretion." (*Id.*, subd. (b)(1).)

reasonable bounds to expedite the trial." (*Avila*, at p. 536.)  Given this framework, Perez has not established that the trial judge's choice to limit counsel to 30 minutes per panel (in addition to 30-page written questionnaires and a preliminary round of questioning by the judge) was an abuse of discretion in these circumstances.

2. *Trial judge's voir dire questions*

Perez claims that "the trial judge endorsed the inconsistent comments of a prospective juror" who had indicated on his written questionnaire that he was not willing to consider "psychological, psychiatric, or other mental health testimony regarding a defendant in determining the appropriate sentence at the penalty phase."  The prospective juror also wrote that he did not "care for a history lesson" and "crime=punishment," and he answered "maybe" in response to a question of whether "it would be hard . . . not to require the defense to prove the defendant is innocent."  In his oral questioning, this prospective juror stated that he "could follow the law."  He again indicated that he found "problematic" that a defendant did not need to present evidence of innocence, but he said he could "live with" the rule.  At the end of the oral questioning, the judge thanked the potential juror for his honesty and told him "[i]t would have been very easy for you to give answers that would automatically disqualify [you]."  Defense counsel objected, explaining that "I'm supposed to be attacking this guy after the court has congratulated him."  The judge responded, "I didn't affirm his answer.  I simply said that I felt that he answered truthfully."  Perez claims that the judge's comments "had the prejudicial effect of sanctioning this prospective juror's improper comments."  He argues that this violation was a structural error because it suggests "a biased tribunal."  We disagree.  The judge's comments here simply commended the juror's honesty. While trial judges should take care to avoid suggesting that any particular answer

25

to a voir dire question is favorable, the judge's comments to this juror did not endorse the substance of the juror's answers or otherwise suggest any preference for the juror's views.

Perez also alleges that the trial judge was more aggressive in instructing potential jurors who Perez contends "would otherwise have been subject to challenges for cause by the defense." Perez argues that these "interventions on behalf of pro-death jurors were designed to have them change their otherwise-objectionable answers" and he claims that the judge failed to act impartially by instructing these jurors in this way. We have explained that the "occasional use of leading questions when attempting to rehabilitate 'death-leaning' jurors" does not "suggest a lack of impartiality." (*People v. Mills* (2010) 48 Cal.4th 158, 190; see also *ibid.* ["We assume the trial court formulated its questions based on the individual characteristics of each juror, including the juror's questionnaire answers and in-court demeanor. To second-guess these choices would encourage the trial court to engage in substantially the same questioning of all prospective jurors irrespective of their individual circumstance, something we have declined to do."].) As in *Mills*, Perez has not established that the trial judge acted improperly in his questioning of these jurors.

### 3. Failure to dismiss jurors

Perez claims that some of the prospective and actual jurors should have been either dismissed, excluded, or disqualified. But defense counsel did not attempt to strike any of these jurors, either for cause or by using a peremptory challenge. In fact, defense counsel used only 10 of the available 20 peremptory strikes and never expressed dissatisfaction with the composition of the jury. We thus "agree with the Attorney General that defendant, having chosen not to challenge [a juror] for cause or peremptorily, and having neither exhausted his

peremptory challenges nor expressed dissatisfaction with the jury, cannot raise on appeal the trial court's failure to excuse [such a juror.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 883-884.)

### 4. *Removed juror*

Perez claims that his rights to due process of law and to trial by jury were violated when the trial judge dismissed a seated juror during the guilt phase proceedings. Just before opening statements, the judge informed counsel that a juror (Juror No. 7) approached him and "indicated that he wanted to discuss with me his level of comfort with sitting on a death penalty case and suggesting that — that he may have some difficulty in that regard." The judge told the juror that the issue would be addressed after the judge spoke to counsel. The jury was then brought in, both sides gave opening statements, and several witnesses testified. At the end of that day, the judge asked the juror at issue to stay behind when the jury was excused. The juror told counsel that the past week had given him "time and reason to reflect further on myself, on the death penalty" and though he wrote on his jury questionnaire that he had no moral, religious, or philosophical qualms with imposing the death penalty, he "no longer" thought he was "capable of making that decision myself." The juror later confirmed that his "state of mind was such that no matter what the aggravating circumstance is and no matter what the mitigating circumstance evidence is," he "could not ever" vote for the death penalty. After a discussion with counsel, the judge dismissed the juror over Perez's objection.

Although the trial court's decision to discharge a sitting juror is reviewed for abuse of discretion, the trial court's factual basis for doing so is reviewed under the "demonstrable reality" standard. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 349; see also *People v. Lomax* (2010) 49 Cal.4th 530, 589-91

27

(*Lomax*).) A trial court may discharge a sitting juror if the court finds the juror is unable to perform his or her duty. (See *Lomax*, at p. 589; § 1089 ["If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate . . . ."].) This "demonstrable reality" standard requires a less deferential, more searching review of the factual predicate for discharging a juror than what is entailed by the substantial evidence standard. (*Lomax*, at p. 589.) Crucially, in order to uphold the trial court's determination, we must conclude " 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.]" (*Ibid.*; see also *id.* at p. 590 ["The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]"].)

Perez claims the record in his case does not show "a demonstrable reality" that the juror at issue here was unable to perform his duty as a juror, since the judge determined only that the juror could not impose the death penalty. But " '[a] juror may be disqualified for bias, and thus discharged, from a capital case if his views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " [Citations.]' " (*Lomax*, *supra*, 49 Cal.4th at p. 589, quoting *People v. Keenan* (1988) 46 Cal.3d 478, 532.) The instructions in this case required jurors to decide whether the aggravating circumstances outweighed the mitigating circumstances and then determine whether death was an appropriate punishment. Juror No. 7 had confirmed that he "could not ever" vote for the death penalty, "no matter what the aggravating circumstance is and no matter what the mitigating circumstance evidence is." Perez concedes that refusal to impose the death

28

penalty is a valid basis to strike a *prospective* juror, but he argues that this hesitance is an improper basis to strike a juror after the trial has begun. Section 1089 does not invite a different standard for dismissing prospective jurors versus seated ones. To the contrary, it says a juror may be discharged "*at any time*, whether before or after the final submission of the case to the jury" if "found to be unable to perform his or her duty." (§ 1089, italics added.) Given this juror's clear indication that he would not be able to perform his duty of choosing whether a death sentence was appropriate, the trial judge had an adequate basis to dismiss the juror for good cause.

Perez claims in the alternative that the juror should have at least been kept on through the end of the guilt phase, since the juror's inability to vote for the death penalty would not affect his duties until the penalty phase. Yet Perez points to no cases requiring a trial judge to keep a dismissible juror on for part of the trial in this way. Instead, he cites three cases from our court addressing whether there was a sufficient basis for a trial judge to conclude that a juror would be unable to perform his or her duty. (See *People v. Pearson* (2012) 53 Cal.4th 306, 327-333; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69-79; *People v. Wilson* (2008) 44 Cal.4th 758, 813-821.) By contrast, in this case we have already accepted the soundness of the judge's conclusion that the juror would be unable to perform his duty during the penalty phase of the trial. The remaining question is whether the judge should have allowed the juror to participate in a portion of the trial despite the juror's inability to perform that duty.

Perez also points to *Jennings v. State* (Fla. 1987) 512 So.2d 169, a case in which a juror revealed during the guilt phase of a capital trial that "she had not been completely candid about her feelings concerning the death penalty." (*Id.* at p. 172.) In particular, the juror revealed that though "she still could render an impartial verdict in the guilt phase, she could not recommend a death sentence."

29

(*Ibid.*)  Neither defense counsel nor the prosecution asked for this juror to be removed during the guilt phase, and the trial court allowed the juror to remain through the end of the guilt phase and then dismissed her after the guilt phase ended.  On appeal, the defendant claimed that the juror should have been kept for the entire trial, past the guilt phase.  That claim is distinct from Perez's claim that a juror should have been kept on for the guilt phase alone.  We have already explained why Juror No. 7 should not have been kept through the penalty phase in this case.  The *Jennings* court took the same view, rejecting the defendant's claim.  As for Perez's argument that the juror here should have been kept during the guilt phase, the Florida Supreme Court said nothing about whether the trial court was *required* to keep the juror for part of the trial in this way.

In California, a judge has discretion to remove a juror for only part of trial, as the trial court did in *Jennings*.  But section 1089 does not distinguish between different portions of a trial or otherwise suggest that a trial court is required to keep a juror for part of a trial if the juror's inability to perform his or her duty is limited to a different phase of the trial.  Instead, the statute says a trial court "may order [a] juror to be discharged" if a juror "is found to be unable to perform his or her duty."  (§ 1089.)  This interpretation of section 1089 finds support in our preference for unitary juries.  (See *People v. Fields* (1983) 35 Cal.3d 329, 351-352.)  The trial court may exercise its section 1089 discretion to remove a juror in the early stages of a trial as a means to "assure — insofar as possible — that the decision-making process of a death penalty case is a coherent whole."  (*Id.* at p. 352.)  With a unitary jury, the decision maker will be more likely to have "full recognition of the gravity of its responsibility throughout both phases of the trial" and knowledge "of lingering doubts that may have survived the guilt phase deliberations."  (*Ibid.*)  Even if an alternate replaces a juror who opposes the death penalty at the start of the penalty phase, that alternate will not have fully engaged

30

in the deliberative process and so would not fully satisfy the concerns we described in *Fields*. (See *id.* at p. 351; *People v. Valles* (1979) 24 Cal.3d 121, 124-128 [holding that an alternate juror *may* sit in the jury deliberation room so long as the alternate juror does not take part in or affect the deliberations].) As a result, we hold that section 1089 allows a trial court to remove a juror before the conclusion of the guilt phase if the juror cannot fulfill his or her responsibilities in the penalty phase. Here, the trial record contains evidence sufficient to satisfy the demonstrable reality standard that the juror would be unable to perform his duty to decide whether a death sentence was due because the juror confirmed that he would never be able to vote for a sentence of death. Accordingly, the trial court did not abuse its discretion when it chose to remove the juror for the entire remainder of the trial on that basis.

### 5. *Lower-income jurors*

Perez claims that the trial court's refusal to provide higher compensation for lower income jurors deprived him of a jury of his peers. We have rejected similar claims in the past. (See, e.g., *People v. DeSantis* (1992) 2 Cal.4th 1198, 1216.) We do the same here.

## C. Prosecutorial misconduct

### 1. *Late disclosure of aggravation evidence*

The prosecution's penalty-phase case included evidence that Perez had raped a girl who was under age 14 when Perez was aged 18 or 19. On March 1, 2001, over six months before the start of jury selection, the prosecutor wrote to defense counsel about his intention to present evidence about this uncharged rape. A few months later, at a hearing on July 27, 2001, the prosecutor named a San Francisco Police Department (SFPD) detective that the prosecutor planned to talk to about the incident. The prosecution filed its formal notice of aggravation on

31

August 16, 2001.  On the same date, the prosecution told defense counsel that the SFPD's file on the uncharged rape appeared to be missing.  Jury selection began on September 12, 2001.  Then, in October 2001, near the end of the guilt phase, a prosecutor turned over portions of a police report related to the incident.  The prosecutor apologized for handing the documents over late but claimed he had not received them earlier.  Perez contends the prosecution purposely delayed in turning over the police reports and filing a formal notice of aggravation.

Perez claims that the prosecution's delays violated his rights under section 190.3, which bars prosecutors in first degree murder cases from presenting penalty-phase aggravating evidence "unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court."  (§ 190.3.)  One purpose of this statute is assigning to trial courts discretion for deciding how much time is enough adequate notice, though we have generally required that notice be provided "before the case is called."  (*People v. Roberts* (1992) 2 Cal.4th 271, 330 ["Section 190.3's plain language gives the court discretion to determine what amount of notice is reasonable, but the evidence must be given to a defendant before the case is called."]; see also *People v. Jurado* (2006) 38 Cal.4th 72, 136 ["Notice provided before jury selection begins is generally considered timely, and the purpose of the notice provision is satisfied if the defendant has a reasonable chance to defend against the charge."].)  More than six months before jury selection began, the prosecution gave defense counsel informal notice.  The prosecutor then conveyed the name of the SFPD detective three months before jury selection began.  The prosecutor filed a formal notice of aggravation on August 16, 2001, almost a month before jury selection began on September 12, 2001.  In these circumstances, the trial court did not abuse its discretion in ruling that the

32

prosecution gave Perez "notice of the evidence to be introduced . . . within a reasonable period of time."  (§ 190.3; *Jurado*, at p. 136.)

Perez further claims this purposeful delay violated the People's federal constitutional obligation to disclose exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83, along with the analogous requirement of the California Constitution.  Under both *Brady* and the California Constitution, the prosecution is only required to disclose evidence that " 'helps the defense or hurts the prosecution, as by impeaching a prosecution witness.' "  (*People v. Verdugo* (2010) 50 Cal.4th 263, 279.)  Perez claims that the police report about the rape incident constitutes *Brady* material, but does not claim that it is exculpatory on its own.  Rather, Perez argues that it would be useful for impeachment and voir dire purposes.  The police report stated that a female victim reported that Perez had sexually assaulted her three times with at least one instance of vaginal rape.  The statements in the police report were consistent with the notice of aggravation, which referred to the alleged incidents of rape.  Moreover, the police report ultimately proved unhelpful to Perez because it was consistent with the victim's testimony that he had sexually assaulted and raped her multiple times.  As Perez presents no proof the prosecution failed to disclose evidence that in any way "helps the defense or hurts the prosecution," he has not established a violation of his rights under either *Brady* or the analogous requirements of California's Constitution.

### 2.  *Other prosecutorial misconduct*

Perez lists five other allegations of prosecutorial misconduct, advancing brief arguments supporting each.  Because we find unpersuasive each of these claims for the reasons discussed below, we also reject Perez's argument that the

cumulative "effect of these individual instances of prosecutorial misconduct" requires reversal.

Perez first contends the prosecution elicited irrelevant victim impact testimony of the victim's husband and daughter during the guilt phase. The Attorney General argues that defendant forfeited this argument because Perez failed to object to this testimony at trial. To avoid forfeiture of a claim of prosecutorial misconduct, a defendant must object and request an admonition. (*People v. Redd* (2010) 48 Cal.4th 691, 746 [ "[A] defendant must object and request an admonition in order to preserve a claim of prosecutorial misconduct, and the objection must be made upon the same ground as that which the defendant assigns as error on appeal."].) Perez failed to do so on this claim and thus the claim is forfeited. Even if not forfeited, the argument fails. The prosecution committed misconduct, Perez argues, by asking the victim's husband how long he had known his wife and by presenting testimony from the victim's daughter — who, Perez asserts, "did not witness anything, did not add anything to the State's case for guilt, and did not view the body." The testimony of both the victim's husband and daughter was relevant to the prosecution's guilt-phase case because it helped narrate the circumstances of Mrs. Daher's murder. The daughter's testimony established the timing of when the men allegedly broke into the home, and the husband's comments about his relationship to his wife helped frame his observations about her routines. None of this testimony was improper. (See *People v. Salcido* (2008) 44 Cal.4th 93, 151 [affirming verdict in capital case in which a murder victim's wife's testimony during the guilt phase that the victim recently changed his work schedule so she would not have to drive during her pregnancy was not improper because the testimony "scarcely touched upon the victim's family life and did not relate the effect of defendant's acts upon family members"].)

Perez next claims the prosecutor improperly vouched for a witness's credibility during the guilt-phase closing argument by saying, "But you think Jason Hart is going to tell the cops that he gave three guys a ride from what amounted to a murder if he didn't do it? Well, we know he didn't do it, so he's not going to do that." As with the first claim, Perez failed to object to this statement or request a limiting instruction, and thus the claim is forfeited. (See *People v. Redd*, *supra*, 48 Cal.4th at p. 746 [requiring objection and request for admonition to preserve prosecutorial misconduct claim].) Even if not forfeited, these statements were not improper: they were based on Hart's testimony, rather than the prosecutor's independent knowledge or beliefs. (See *People v. Frye* (1998) 18 Cal.4th 894, 971 ["[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching."], disapproved on other grounds in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

Perez third claims that the prosecution asked improper or argumentative questions "designed to discredit" penalty-phase witness Susan Frankel, an attorney who knew Perez through a mentorship program for California Youth Authority parolees. Perez's objections to those questions were sustained and defense counsel did not request any further jury instruction about them. Even assuming the prosecutor's statements were improper, Perez fails to demonstrate prejudice. (See *People v. Riggs* (2008) 44 Cal.4th 248, 298 ["Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted."].) Although the prosecution's

35

questions to Susan Frankel were potentially argumentative, the fact that the judge sustained the objections to the questions and that Susan Frankel's testimony played a small role in the penalty phase of trial demonstrates a lack of prejudice arising from any asserted error.

Fourth, the prosecutor asked the jury to make Perez "sit on death row until his appeals process is over" during the prosecutor's penalty-phase closing argument. Perez claims this statement suggested that his appeals would succeed. Defense counsel did not object to the reference to the appeals process but later moved for a mistrial on account of that statement along with others. Prosecutors must exercise great caution in making any reference to the appeals process in a case, since an emphasis on that process can serve to diminish a juror's sense of responsibility about the profound task that every criminal trial requires the jury to undertake. This concern is especially acute in capital cases, where jurors hold a person's life in their hands. Nonetheless, Perez must demonstrate that the prosecutor's statements caused prejudice. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 298.) In this case, all that the prosecutor told jurors about the appeals process was that Perez would await the end of the appeals process before his death sentence could be lawfully carried out. This reference in the closing statement of the penalty phase of the trial was too slight and tangential to diminish the jury's sense of responsibility about its task.

Fifth, the prosecutor asserted during the penalty-phase closing argument that Perez never appeared to show remorse. The prosecutor also mentioned that Perez and the other suspects had seemed to "celebrate" by drinking beer and doing cocaine at various times on the night of the crime. Defense counsel again did not object but later moved for a mistrial on account of that statement along with others. We have repeatedly held that prosecutors may comment on a defendant's lack of remorse in committing a capital crime. (See, e.g., *People v. Hawthorne*

36

(2009) 46 Cal.4th 67, 94, abrogated on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610.)

## D. Accomplice testimony

Perez claims that the testimony of Maury O'Brien and Jason Hart was unlawful, first because it was insufficiently corroborated and second because it was made unreliable by promises that the prosecution made to the witnesses. On the first point, Perez argues that the testimony did not satisfy the requirements of section 1111, which provides, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) The term "accomplice" is then defined as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*)

We have interpreted section 1111 to require "evidence tending to connect defendant with the crimes 'without aid or assistance from the testimony of' " the accomplice. (*People v. Davis*, *supra*, 36 Cal.4th at p. 543, quoting *People v. Perry* (1972) 7 Cal.3d 756, 769.) We recently explained that evidence corroborating accomplice testimony " 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) But the evidence must nonetheless connect the defendant to the crime itself, rather than simply connect the accomplice to the crime. (See *id.* at p. 36 ["[A]n accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the

37

crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony."].)

O'Brien's testimony was corroborated by enough evidence to satisfy section 1111's requirements. Eyewitnesses from the neighborhood placed Perez and the two other men near the scene of the crime during the timeframe when Mrs. Daher was killed. A series of other witnesses then testified that they met Perez and the two men immediately after the killing, at which time the men tried to sell some of the stolen property. The timeframe of the crime was also confirmed by the evidence of when and where the stolen SUV was abandoned, as well as when and where the men checked into a motel near the site of the abandoned vehicle. While this array of evidence did not "corroborate every fact to which the accomplice testifie[d]" and could perhaps be characterized as "circumstantial or slight and entitled to little consideration when standing alone," it tends to connect Perez to much of the narrative established by O'Brien's testimony. (See *Romero and Self*, *supra*, 62 Cal.4th at p. 32.) As for Hart, the Attorney General claims that section 1111 did not apply to his testimony to the extent Hart was not "liable to prosecution for the identical offense charged against the defendant on trial." (§ 1111.) We need not decide whether this conclusion is correct. Even if section 1111's requirements apply to Hart's testimony, what Hart said about Perez's commission of the four charged offenses was sufficiently corroborated by other evidence.

Separate from his argument about corroboration, Perez further argues the accomplice testimony was unreliable because the accomplices were promised immunity in exchange for their cooperation. Only Hart appears to have been

38

awarded immunity. As for O'Brien, whose testimony dominates Perez's claim about the accomplice testimony, he testified that he had not received immunity of any kind. He also told jurors that neither the police nor prosecutor had offered him anything in exchange for his testimony. At any rate, we have long "rejected the contention that the testimony of an immunized accomplice necessarily is unreliable and subject to exclusion." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1010.) Perez claims that his "argument is that [the accomplice testimony] was unreliable in *this case*" though he gives no reason why the testimony at issue in this case was unique in a way that its reliability was not assured through the normal mechanisms (cross-examination, comparison with other evidence, and the jury's assessment of a live witness's credibility). The jurors at Perez's trial were even instructed that, in evaluating the credibility of the witnesses, they should consider any prior criminal conduct reflecting adversely on credibility, along with whether the witnesses were testifying under a grant of immunity. Each witness told the jury about what they had been promised in exchange for incriminating Perez, and the trial record does not cast doubt on this testimony's truth. Perez presents no basis to believe that either O'Brien or Hart were coerced in a manner that jurors would have been unable to discern when assessing their credibility.

### E. Autopsy evidence

Mrs. Daher's autopsy was performed by a pathologist named Susan Hogan, who worked for a private company that had a contract with Contra Costa County to perform autopsies. Hogan testified at Snyder's trial but had moved out of the area by the time of Perez's trial, so the prosecution presented testimony about the autopsy from another pathologist from the same company named Brian Peterson. The prosecution never proffered evidence showing that Hogan was unavailable to testify. (See Evid. Code, § 240, subd. (a).) Peterson had zero involvement with

39

Mrs. Daher's autopsy, and his entire knowledge of the autopsy came from Hogan's report, which was never admitted into evidence.

Peterson's testimony included a description of the signs that Daher was strangled, including marks around her neck, bleeding in the whites of her eyes, bleeding in the muscles of her neck, and a furrow around her neck. He testified that these "changes in the face [] implied that that force had indeed contributed to this lady's death." Peterson also characterized the severity and cause of various stab wounds. Peterson asserted, for example, that for six different stab wounds "it's safe to say that . . . the knife was pushed in far enough so that the entire blade was inside the body." The prosecutor then showed Peterson the knife that was in evidence, and Peterson testified that "this knife is certainly consistent with every injury that we saw here that was delivered by sharp force." At times, Peterson expressly relayed observations that Hogan had recorded at the autopsy, saying things like "Dr. Hogan estimated," "she noted," and "[her] findings included." Peterson also shared various reasons why he believed "that the strangulation happened first" and that "the major force in this case was . . . the strangulation." Though Peterson believed "that relatively lethal to sub lethal force had already been delivered before those stab wounds," he testified that he could "say unequivocally, based on the blood inside the chest, that her heart was still beating at the time those stab wounds were delivered." Asked if "in your opinion would the cause of death be a combination of ligature strangulation and stabbing," Peterson answered yes.

Perez claims Peterson's testimony violated the confrontation clause because it contained out-of-court, testimonial statements offered for their truth — that is, testimonial hearsay statements — that Perez had no opportunity to confront. Years after Perez's trial, *Crawford v. Washington* (2004) 541 U.S. 36 established that the confrontation clause bars the government from introducing such

40

testimonial hearsay statements unless (1) there is a showing that the declarant is unavailable, and (2) the defendant had a prior opportunity to cross-examine the declarant. (*Id.* at pp. 53-54; see also *Michigan v. Bryant* (2011) 562 U.S. 344, 354 [holding that "testimonial hearsay" statements must be excluded unless the prosecution satisfies *Crawford*'s requirements], quoting *Davis v. Washington*, 547 U.S. 813, 826.)[3]  Here, the prosecution has not shown unavailability or prior opportunity for cross-examination, so the confrontation clause would bar the parts of Peterson's testimony that constitute testimonial hearsay. A statement is testimonial hearsay only if it is (1) hearsay under a traditional hearsay inquiry and (2) testimonial within the meaning of *Crawford* and its progeny. (*People v. Sanchez* (2016) 63 Cal.4th 665, 680 (*Sanchez*) ["The first step is a traditional hearsay inquiry . . . . If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term."].)

In Perez's opening brief, Perez challenges Peterson's testimony from trial generally, but supplemental briefing narrows Perez's confrontation clause challenge. One month after Perez's opening brief, we issued *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), which addressed whether statements in autopsy reports are testimonial. (*Id.* at pp. 618-621.)  Multiple state courts have subsequently addressed similar issues. (See, e.g., *Miller v. State* (Okla.Crim.App. 2013) 313 P.3d 934, 967-973.)  We also recently issued *Sanchez*, *supra*, 63

---

[3]     A defendant may also forfeit a confrontation clause challenge by engaging in wrongdoing that renders the declarant unavailable with an intent to prevent that declarant's in-court testimony. (*Giles v. California* (2008) 554 U.S. 353, 377.) No evidence of such a forfeiture is present here.

41

Cal.4th 665, in which we addressed the circumstances where an expert's statements at trial constitute hearsay. (*Id.* at pp. 679-686.) In light of these cases, we requested supplemental briefing from Perez and the Attorney General on the hearsay and confrontation clause issues. In that supplemental briefing, Perez narrowed the scope of his confrontation clause challenge. Instead of the whole of Peterson's testimony, Perez challenges only particular statements that Perez asserts could only have been obtained from Hogan's autopsy report. These statements include descriptions of the hemorrhaging of the victim's eyes, the depth of knife wounds on the victim's body, and internal injuries caused by the stabbings. We thus analyze the hearsay and confrontation clause issues with respect to this narrowed challenge.

We first address whether the challenged statements are hearsay. If an expert testifies to case-specific out-of-court statements on which he or she relied for their truth to form an opinion, such statements are also "necessarily considered by the jury for their truth, thus rendering them hearsay." (*Sanchez*, *supra*, 63 Cal.4th at p. 684.) But an expert may nonetheless "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so" without violating hearsay rules or the confrontation clause. (*Id.* at p. 685; *see also People v. Leon* (2015) 61 Cal.4th 569, 603 ["It is also clear that testimony relating the testifying expert's own, independently conceived opinion is not objectionable, even if that opinion is based on inadmissible hearsay."].) Here, Peterson's description of the hemorrhaging in the victim's eyes, the depth of knife wounds, and the internal injuries caused by the stabbing related case-specific facts about the victim's body that were taken directly from Hogan's autopsy report and no other sources. (See, e.g., *Sanchez,* at p. 677 [holding that "hemorrhaging in the eyes was noted during the autopsy of a suspected homicide victim" could be case-specific out-of-court statement if no other exhibits established that fact].) Peterson also presented these

42

facts as true, and relied on their purported truth in forming his opinion. These statements thus constitute hearsay under *Sanchez*.

Even if we assumed hearsay statements in an autopsy report are admissible under an applicable hearsay exception (see, e.g., Evid. Code, §§ 1280, 1271; cf. *People v. Clark* (1992) 3 Cal.4th 41, 158-159; *People v. Beeler* (1995) 9 Cal.4th 953, 978-981), a separate question would remain: whether the statements constitute testimonial hearsay under the confrontation clause as interpreted by *Crawford* and its progeny (see *Sanchez*, *supra*, 63 Cal.4th at p. 685 & fn. 12). In *Dungo*, we held that "anatomical and physiological observations about the condition of the body" are "not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right." (*Dungo*, *supra*, 55 Cal.4th at pp. 619, 621.) We need not address *Dungo*'s continued viability here because any federal constitutional error arising from the admission of these statements was harmless beyond a reasonable doubt.[4] (See *Chapman*, *supra*, 386 U.S. at p. 24; *People v. Pearson* (2013) 56 Cal.4th 393, 463.)

A comparison of the evidence at trial and the hearsay statements shows why. At trial, evidence bearing no connection to the hearsay statements, such as photographs and police testimony, showed that someone had choked Mrs. Daher and stabbed her multiple times. These facts were not disputed. The exact depth of the stab wounds, the fact that the victim's eyes contained hemorrhages, and the details on her internal injuries, in light of the other evidence at trial, were such minor pieces of evidence that they had no effect on the jury's ultimate determination of Perez's guilt.

---

[4]    Perez also contends that the hearsay statements do not fall into an applicable hearsay exception (see Evid. Code, §§ 1280, 1271), and thus were inadmissible under state law alone. But as with the alleged confrontation clause error associated with the admission of these hearsay statements, in this case, any state law error was harmless beyond a reasonable doubt.

Yet Perez nonetheless contends that he still suffered prejudice, because of the differing opinions of Hogan and Peterson about the cause of death. Hogan testified at Perez's co-defendant's trial that because of the small amount of blood in the victim's lungs, the victim had died before she was stabbed. Peterson, in contrast, opined that the victim was still alive, but had a weak heartbeat when someone stabbed her. Perez argues that these differing opinions show prejudice, on the theory that the timing of the victim's death could alter defendant's perceived culpability, at least at the penalty phase. But there is a disconnect between the statements Perez challenges from Peterson's testimony — which only encompass factual statements about the victim's body — and this claim of prejudice. Even if the challenged factual statements were testimonial hearsay, Peterson's opinion about the cause of death was admissible. While Peterson relied on hearsay in forming his opinion, he is permitted to do so under *Sanchez* and Evidence Code section 802. (See *Sanchez*, *supra*, 63 Cal.4th at p. 685 ["Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so."].) The jury would have thus heard Peterson's opinion about the cause of death even if the trial court had denied admission of the challenged hearsay statements. So we conclude that any error was harmless beyond a reasonable doubt.

## F. Other evidentiary issues

### 1. Crime scene photo

Perez claims the trial judge erred in denying defense objections to the introduction into evidence of one photo of the crime scene. Prior to trial, defense counsel moved to preclude the prosecution from introducing into evidence any photos of the victim's body. The trial court reviewed the photos and then admitted three crime scene photos and four autopsy photos. Defense counsel objected,

44

claiming that one of the crime scene photos and one of the autopsy photos were duplicative of other photos. Time and again, we have explained that the admission of photographs alleged to include disturbing details is essentially a relevance question, over which trial courts retain considerable discretion. (*People v. Roldan* (2005) 35 Cal.4th 646, 713, disapproved on other grounds in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 353-354.) We have also explained that prosecutors "are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule* (2002) 28 Cal.4th 557, 624; see also *People v. Pierce* (1979) 24 Cal.3d 199, 211 [" '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.' "].)

Perez points to the opinion in *People v. Marsh* (1985) 175 Cal.App.3d 987, in which the Court of Appeal said that where "[a]utopsy photographs have been described as 'particularly horrible,' and where their viewing is of no particular value to the jury, it can be determined the only purpose of exhibiting them is to inflame the jury's emotions against the defendant." (*Id.* at pp. 997-998.) In *Marsh*, the prosecutor sought to introduce photos that even he admitted were " 'terribly gruesome and terribly upsetting.' " (*Id.* at p. 997.) For instance, one photo displayed the child victim's exposed brain, including his dangling bloody scalp. In the background of the photo was the child's blood-splattered torso "with the ribcages rolled back to expose the bowels." (*Id.* at p. 996.) On appeal, the court held that the autopsy surgeon's testimony was sufficient to make the prosecution's point regarding the amount of force used to inflict fatal blows to the victim. (*Id.* at p. 998.) But the Court of Appeal took care to reiterate that the trial court maintains discretion to admit autopsy photos "even where they are only

cumulatively used to graphically portray injuries already detailed in the testimony of a doctor witness." (*Ibid.*)

Unlike the photos in *Marsh*, the autopsy photos introduced here were devoid of blood and showed little of the victim's face. As for the crime scene photos, they depicted the victim's body from a distance, with her face hidden from view. These photos were probative to the questions of the requisite state of mind of the perpetrator because the severity and number of wounds helped establish that the killing was intentional. The photos also helped to corroborate Maury O'Brien's description of where and how Mrs. Daher was killed. Even if the photos were unsettling, the degree of prejudice did not outweigh the probative value enough to exceed the trial court's discretion.

### 2. *Jason Hart's immunity agreement*

Perez claims the trial court and prosecutor vouched for the credibility of prosecution witness Jason Hart by disclosing a portion of Hart's immunity agreement. Prior to Hart's testimony, the jury was told that Hart was granted immunity from prosecution. Hart then disclosed that he could not be prosecuted for various crimes related to the issue if he testified truthfully. Perez claims that the disclosure of the immunity agreement was prejudicial to the defense because it gave the jury the impression that Hart was necessarily telling the truth. We have long "require[d] full disclosure to the jury of any agreement bearing on the witness's credibility, including the consequences to the witness of failure to testify truthfully." (*People v. Fauber* (1992) 2 Cal.4th 792, 823; see also *People v. Frye*, *supra*, 18 Cal.4th at p. 971 [ruling that prosecutor properly read to the jury the terms of a witness's immunity agreement, which stated that defendant had "promised to tell the truth in exchange for the district attorney's promise to refrain

from charging her with any crimes relating to the . . . murders"].) The trial court properly allowed the jury to learn about Hart's immunity agreement.

### 3. *Maury O'Brien's taped interview*

Perez also contends the trial court should have granted his motion for a mistrial after the prosecution introduced a tape recording of Maury O'Brien's law enforcement interview. That interview, Perez argues, contained three improper comments by O'Brien. First, O'Brien stated that Perez "just got out of the penitentiary." Both the prosecution and judge agreed that the jury should not have heard this comment, and the judge told jurors to disregard the comment as both speculative and irrelevant. The judge also asked jurors if they would be able to disregard the comment, and all jurors nodded affirmatively. Second, O'Brien told officers that Perez "wants to kill me right now because he knows that I saw him." The prosecution agreed the jury should not have heard this comment. Though the statement appeared in a transcript of O'Brien's interview, the attorneys noticed the mistake during a break in the proceedings and the jury was given a revised transcript with the statement redacted. Third, the tape contained two brief references to a "test" that officers would administer on O'Brien. The jury never heard any explanation of what this "test" was, and the trial court told jurors to disregard the reference.

Perez is correct in one respect: Disclosing a defendant's prior criminality to the jury can prejudice the defendant's case. But here again, courts have "considerable discretion" to determine whether such an error warrants granting a mistrial or whether the error can be cured through admonishment or instruction. (*People v. Haskett* (1982) 30 Cal.3d 841, 854 ["A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a

47

speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."]; see also *People v. McLain* (1988) 46 Cal.3d 97, 113 [holding that the trial judge properly denied a motion for mistrial based on a prosecutor's allegedly improper comment during closing argument, since "the admonition given was sufficient to prevent the harm"].)  In this case, the jury's exposure to Perez's past criminality was a brief comment in a recorded interview played for the jury.  The mistake was recognized quickly, and the court crafted a remedy by telling jurors that the comment was speculative and irrelevant and then confirming that they would be able to disregard it.  This remedy was an acceptable alternative to granting a mistrial, given the minor nature of the error.  As for the statement that Perez wanted to kill O'Brien, assuming error, Perez suffered no prejudice because the page of the transcript containing this comment was replaced with a redacted version as soon as counsel discovered the error and the record contains no basis to believe the brief exposure to the statement caused prejudice.  As for O'Brien's reference to a "test," the jury received no further information about this test and was told to disregard the comment.  The trial court did not abuse its discretion by denying Perez's motion for a mistrial.

### 4.  Coaching of Maury O'Brien

Perez claims the trial court improperly "coached" Maury O'Brien by asking O'Brien to clarify his answer to a question during his direct examination.  O'Brien testified that he, Snyder, and Perez boarded a BART train at the Balboa Park station in San Francisco, intending to take the train to Fairfield.  The men then got off at the Orinda station to smoke cigarettes.  O'Brien said that their plans changed at some point after that stop.  In response, the prosecutor asked, "Were you guys still doing dope?"  O'Brien answered that he and Snyder "did dope at BART before we got on BART and after we got off BART before we started walking up

to — back into the hills." The trial judge then interrupted to ask, "At what BART station?" "Lafayette BART station," O'Brien replied. Perez claims that the judge's question helped O'Brien modify his testimony, depriving the defense of a chance to exploit the inconsistency during cross-examination. Trial courts may question witnesses to elicit material facts or clarify confusing or unclear testimony, so long as the questions remain " ' "temperate, nonargumentative, and scrupulously fair" ' " and do not "convey to the jury the court's opinion of the witness's credibility." (*People v. Cook* (2006) 39 Cal.4th 566, 597.) The trial judge did not exceed those limitations here. He merely asked the witness to clarify at which train station the men exited, in response to a complicated narrative that involved several train stations.

### 5. *Incidents during defendant's prior incarceration*

The prosecution asked to present penalty-phase evidence of five violent incidents from while Perez was incarcerated. After hearing arguments from counsel, the court barred evidence of two of the incidents. Perez claims that the evidence from the other three incidents should have been excluded as well. He argues that "[t]here was no evidence appellant initiated" the first incident; that the second "seemed to be consensual"; and that the third incident involved him acting in defense of another. Perez points to no cases or other authorities that support his argument, and we rejected similar claims in *People v. Moore* (2011) 51 Cal.4th 1104, 1135-1139. We reject Perez's claims too.

### 6. *Audience outburst*

During the cross-examination of a prosecution witness who claimed Perez had raped her when she was a child, the witness's father spoke up from the audience. After the witness agreed with defense counsel that she had "mixed feelings" about the issue, the trial transcript reflects a person in the audience

49

saying, "Just like a 13 year old. You're leading the witness on here." The judge started to respond but the man interrupted saying, "[M]y daughter was 13 years old, your Honor." The court ordered a recess, during which the speaker was confirmed to be the witness's father. He apologized for the outburst, and defense counsel did not ask the trial judge to instruct the jury to disregard his comments. Perez claims on appeal that "the court had a *sua sponte* duty to admonish and inform the jury that they should disregard any comments from this spectator." We have held that a "defendant's failure to object to and request a curative admonition for alleged spectator misconduct waives the issue for appeal if the objection and admonition would have cured the misconduct." (*People v. Hill* (1992) 3 Cal.4th 959, 1000, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Because defense counsel never asked for the judge to comment on the spectator's remarks, we see no reason to treat the judge's failure to comment on those remarks as grounds for reversal. Consistent with our past decisions in this area, we consider Perez to have waived this issue.

### 7. *Prejudicial victim impact evidence*

Perez claims the trial judge should not have allowed certain victim impact evidence during the penalty phase. The Eighth Amendment does not categorically bar victim impact evidence. (*Payne v. Tennessee* (1991) 501 U.S. 808, 827.) To the contrary, witnesses are permitted to share with jurors the harm that a capital crime caused in their lives. (*Id.* at p. 825 ["[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant."].) Still, a defendant can challenge victim impact evidence that renders a sentencing proceeding "fundamentally unfair." (*Ibid.*; see also *id.* at p. 831 (conc. opn. of O'Connor, J.).) In striking this balance

50

between proper victim impact evidence and fundamentally unfair evidence, this court has explained that the effects of a capital crime are relevant and admissible as a circumstance of the crime unless the evidence " 'invites a purely irrational response from the jury.' " (*People v. Garcia* (2011) 52 Cal.4th 706, 751.) *Garcia* rejected the notion that admissible victim impact evidence is limited to the " ' "immediate injurious impact" ' " or to "effects 'known or reasonably apparent' to defendant at the time it was committed." (*Ibid.*) We explained that prosecutors may present testimony "from those who loved the murder victim" showing " 'how they missed having [the victim] in their lives.' " (*Ibid.*, quoting *People v. Boyette* (2002) 29 Cal.4th 381, 444.)

The prosecution's final two witnesses during the penalty phase were the victim's daughters, Lauren and Annie. Lauren was 15 when her mother was killed. She told jurors that her mother's death was "the hardest thing I think I could ever even imagine[]" and that she had since "turned into the mom of the family." She also testified that "[m]y entire junior year of high school, I didn't really go to school because I couldn't get up in the morning." Annie was 12 when her mother was killed. She testified that "a lot of times I'm just so sad that I can't — I — that I can't really do anything." Perez fails to show that the testimony from the victim's daughters rendered the proceeding "fundamentally unfair" or invited a "purely irrational response." Each daughter offered her personal perspective on the impact of her mother's death. This evidence shed light on the family's ongoing grief, thereby "informing the sentencing authority about specific harm caused by the crime in question." (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 825.)

51

### 8. *Presence of victim's family*

Perez claims that the presence of the victim's family members in the courtroom violated his right to due process and equal protection. Crime victims and their families are routinely present at trials, and the Sixth Amendment right to a public trial creates a "presumption of openness" that ordinarily allows victims or other members of the public to observe trials. Where a party seeks exclusion of the public, the presumption of openness can be rebutted only when the party shows the public's exclusion was "necessary to protect some 'higher value' such as the defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings." (*People v. Woodward* (1992) 4 Cal.4th 376, 383.) Given the ubiquity of crime victims and their families observing trials, Perez's generalized claims that the mere presence of the victim's family was improper "victim impact evidence" does not rebut the constitutional presumption of open criminal trials.

## G. Instructional errors

### 1. *CALJIC Former No. 17.41.1*

Perez argues that the trial court should not have instructed the jury with CALJIC former No. 17.41.1, which, as modified by the trial court, stated, "The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. [¶] Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of that situation." Though in 2002, we disapproved use of this particular instruction in trials going forward from that point, we have since that case repeatedly "rejected similar claims that the instruction violates a defendant's federal constitutional rights." (*People v. Brady* (2010) 50 Cal.4th 547, 587; see also *People v. Wilson*,

*supra*, 44 Cal.4th at pp. 805-806.)  Perez was tried before our 2002 opinion disapproving the use of CALJIC former No. 17.41.1, and he fails to show why our precedent should not control here.

### 2. Section 190.3

The prosecution presented evidence that Perez raped a child aged under 14. The court instructed the jury on the elements of both forcible rape and lewd acts with a child under 14.  Perez claims that instruction on this second crime was prejudicial and irrelevant.  The prosecution requested the instruction on this crime out of concern that a revocation of consent during intercourse was not considered rape under California law at the time of trial.  (See *People v. Vela* (1985) 172 Cal.App.3d 237, 242 [holding that a defendant is not guilty of forcible rape if a victim withdraws consent during intercourse], disapproved of in *In re John Z.* (2003) 29 Cal.4th 756, 760-763.)  But the uncontradicted evidence at trial showed that Perez did in fact use force to overcome the victim's will, so jurors could not have found that Perez had sex with the victim without believing that he used force either before or during intercourse.  Any error in instructing the jury on the elements of lewd acts was therefore harmless.

### 3. CALJIC No. 8.88

The court instructed the jury with CALJIC No. 8.88, which provides in part, "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."  During closing argument, defense counsel told the jury that it was required to vote for life if it found the aggravating and mitigating circumstances equal.  The judge interrupted, saying that defense counsel misstated the law and the jury should ignore counsel's statement.  After defense counsel finished the closing argument,

53

the judge gave a clarifying instruction that tracked CALJIC No. 8.88. Perez claims the judge should not have given this clarifying instruction, and he asserts the instructions were unconstitutional. Perez acknowledges that we previously rejected similar challenges. We reject his claim too.

## H. California's death penalty statute

Perez advances several claims about the constitutionality of California's capital sentencing scheme that he concedes "have been rejected by this Court." We are not persuaded to reconsider our precedent. (*People v. Winbush* (2017) 2 Cal.5th 402, 488.) The state's death penalty scheme does not violate the federal Constitution by failing to: require written findings from the jury as to aggravating and mitigating factors (see, e.g., *id.* at p. 490); require jurors to find aggravating factors beyond a reasonable doubt (see, e.g., *id.* at p. 489); require jurors to find aggravating factors unanimously (see, e.g., *ibid.*); adequately narrow the class of offenders eligible for the death penalty (see, e.g., *id.* at p. 488); adequately narrow prosecutorial discretion as to who is charged with capital crimes (see, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 992); or require either "intercase proportionality review" or "the disparate sentence review that is afforded under the determinate sentence law" (*People v. Williams* (2016) 1 Cal.5th 1166, 1205). Nor did the trial court err either by instructing the jury about the aggravating and mitigating factors using a unitary list (see, e.g., *People v. Myles* (2012) 53 Cal.4th 1181, 1222) or by telling jurors to consider section 190.3 factors "if applicable" (see, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 439-440).

## I. Proportionality

Perez claims his sentence is unconstitutional because it is disproportionate relative to the punishment his accomplices received. What we have previously held is that "the federal Constitution does not require us to incorporate into our

proportionality determination any comparison of defendant's sentence with that of another culpable person, whether charged or uncharged." (*People v. Hill*, *supra*, 3 Cal.4th at p. 1014.) Even if we were to undertake this comparison though, Perez's culpability here appears deeper than that of Snyder and O'Brien. Perez argues that the fact that he "has been sentenced to death while the prosecutor did not even seek death against the other defendants demonstrates a lack of proportionality." But Snyder was 17 at the time of the crimes, and California's capital punishment statute has long provided that "the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime." (§ 190.5.) As for O'Brien, he testified that he did not encourage or participate in the homicide other than to follow Perez's orders and hand Perez the knife. Given the gravity of the offense here as well as the evidence of Perez's particular role, Perez's sentence does not violate any Eighth Amendment requirement of proportionate sentencing.

## J. Equal protection, international law

Perez claims his sentence violates equal protection principles under both federal and international law, along with a number of other requirements of international law. He concedes that we have repeatedly rejected these claims on the grounds that distinctions between capital and noncapital sentences are sufficiently justified and that international law is not a basis to invalidate sentences that are lawful under domestic law. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1290 [" '[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws.' "]); *People v. Jennings* (2010) 50 Cal.4th 616, 690 [" 'International law does not prohibit a sentence of death rendered in accordance

55

with state and federal constitutional and statutory requirements.' "].)  We do the same today.

## K.  Lethal injection

Perez claims his death sentence is illegal because it will be carried out using a method of lethal injection that violates the Eighth Amendment.  But this "challenge to the method of a future execution is not cognizable on appeal, because such a claim does not impugn the validity of the judgment." (*People v. Burney* (2009) 47 Cal.4th 203, 270.)

## L.  Cumulative error

Perez claims that the errors he has asserted were cumulatively prejudicial even if they were individually harmless.  The only issues we resolve purely on harmless error grounds are the following:  Perez's absence from the discussion between Judge Spinetta and Perez's counsel about a conflict of interest; the admission of hearsay evidence from an autopsy report through an expert's testimony; some of the claims of prosecutorial misconduct; the accidental inclusion, in a transcript given to the jury, of O'Brien's testimony that Perez wanted to kill him; and the jury's instruction on the elements of lewd acts with a child under 14, in relation to evidence of a prior uncharged rape.  None of these potential errors, nor their cumulative effect, warrants reversal.

III.

The judgment is affirmed.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**[*]

---

[*] Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Perez
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S104144
**Date Filed:** March 1, 2018
_____

**Court:** Superior
**County:** Contra Costa
**Judge:** Peter L. Spinetta


_____

**Counsel:**

A. Richard Ellis, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Ronald S. Matthias, Assistant Attorney General, Alice B. Lustre, Glenn R. Pruden and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

A. Richard Ellis
75 Magee Avenue
Mill Valley, CA  94941
(415) 389-6771

John H. Deist
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5855