Filed 9/27/23  P. v. Perez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079220 |
| v. | (Super.Ct.No. RIF112730) |
| EZEKIEL PEREZ, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy J. Hollenhorst, Judge.  Reversed and remanded with directions.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Daniel Rogers, Vincent P. LaPietra and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

Petitioner Ezekiel Perez, Jr., supplied a gun to a fellow gang member and drove him to the scene of a planned robbery.  For unknown reasons, however, instead of

1

robbing the victim, the fellow gang member shot and killed him. As a result, Perez was convicted of first degree murder with a gang enhancement.

This appeal arises out of Perez's petition to vacate his murder conviction pursuant to Penal Code section 1172.6.[1] The trial court denied it, after an evidentiary hearing, finding that Perez was a major participant in the underlying attempted robbery, and that he acted with reckless indifference to life.

Perez contends that each of these two findings was not supported by substantial evidence. We agree that there was insufficient evidence that Perez acted with reckless indifference to life. Thus, we need not decide whether there was substantial evidence that he was a major participant.

I

STATEMENT OF THE CASE

In 2012, in a jury trial, Perez was found guilty of first degree murder (§ 187, subd. (a), former § 189, subd. (a)), with a gang enhancement (§ 186.22, subd. (b)(1)). The only theory of murder on which the jury was instructed was felony murder. He was

---

[1] All further statutory citations are to the Penal Code, unless otherwise indicated.

The petition was actually filed under former section 1170.95. (Stats. 2018, ch. 1015, § 4, amended by Stats. 2021, ch. 551, § 2.) Effective June 30, 2022, former section 1170.95 was renumbered as section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will use section 1172.6, somewhat anachronistically, to refer to whichever one of the two statutes was in effect at the relevant time.

sentenced to 25 years to life. In his direct appeal, we affirmed. (*People v. Perez* (Aug. 18, 2014, E055735) [nonpub. opn.].)

In 2019, Perez filed a petition pursuant to section 1172.6. The trial court appointed counsel, found a prima facie case, and held an evidentiary hearing.

The prosecution broadly requested judicial notice of "[t]he files and records in" the underlying criminal case. More specifically, it also requested judicial notice of the supplemental clerk's transcript from the appeal, certain volumes of the reporter's transcript from the appeal, plus our opinion in the appeal; it furnished copies of these to the court. The trial court took judicial notice only of our opinion. In addition, Perez took the stand and testified.

At the end of the evidentiary hearing, the trial court denied the petition, because it found, independently and beyond a reasonable doubt, that Perez was a major participant in the underlying attempted robbery and acted with reckless indifference to life. It also found that Perez was not credible — that he had tried "to pick and choose what [he] wanted the Court to know . . . ."

## II

## THE SOURCE OF THE FACTS

We face a preliminary question as to what facts we should consider.

To recap, the prosecution requested judicial notice of most of the appellate case file, plus our appellate opinion. The trial court, however, granted judicial notice solely of our opinion, and it appears to have relied solely on our opinion.

In this appeal, however, both sides rely on facts that they cite to the clerk's transcript and reporter's transcript from Perez's direct appeal (as included in the request for judicial notice below).

To make matters even more complicated, by relying on our appellate opinion, the trial court erred. Section 1172.6, as originally enacted, provided that "the record of conviction" was admissible at an evidentiary hearing. (Former § 1170.95, subd. (d)(3), Stats. 2018, ch. 1015, § 4.) However, it was amended, effective January 1, 2022, so as to add the following italicized language: "At the hearing to determine whether the petitioner is entitled to relief, . . . *[t]he court may . . . consider the procedural history of the case recited in any prior appellate opinion*." (Former § 1170.95, subd. (d)(3), Stats. 2021, ch. 551, § 2, italics added.) In February 2022, we held that, by allowing consideration of "the procedural history" in a prior appellate opinion, the Legislature intended to prohibit consideration of "the factual summar[y]" in a prior appellate opinion. (*People v. Clements* (2022) 75 Cal.App.5th 276, 292; accord, *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9.)

The evidentiary hearing here was held in June 2022. Nevertheless, the trial court relied solely on our prior opinion, and neither side objected.

On one hand, by failing to object, both sides forfeited the trial court's error. (Evid. Code, § 353, subd. (a).) Thus, we could properly review the sufficiency of the evidence based on our prior opinion alone. On the other hand, because both sides cite the appellate

4

case file in their briefs, they have effectively stipulated that we *could* properly review the sufficiency of the evidence based on that file. We have the choice to proceed either way.

We elect to use our prior opinion, because it would be bizarre to review the sufficiency of evidence that the trial court never actually considered. "'[A]n appeal reviews the correctness of a judgment as of the time of its rendition, *upon a record of matters which were before the trial court* for its consideration.' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405, italics added.) Moreover, the People, in arguing that the evidence was sufficient, generally do not rely on any facts that are not adequately shown by our prior opinion.[2] Accordingly, parts III.A through III.D of our statement of facts are taken verbatim from the prior appeal, except that we have changed "defendant" to "Perez" throughout.

### III

### STATEMENT OF THE FACTS

A. *Veronica Cantu's Testimony Against Perez.*

At the time of trial in October 2011, Cantu had known Perez since 1987, when they were in junior high school together. On the night of September 30, 2003, Cantu, Gutierrez, Perez, and several other people were smoking methamphetamine at Cantu's

---

[2] There is one exception. Our prior opinion largely did not discuss the gang evidence. The People cite the gang expert's testimony that gang members "main goal[]is to earn respect within the gang" and that "[t]he deadlier you are, the more respected you are." They argue this shows that Perez would have known that "Gutierrez needed to protect his reputation in the gang by either accomplishing the robbery or committing a violent act." We discuss this point, for the sake of argument, in part V, *post*.

5

apartment in Corona.  Perez lived several blocks away from Cantu and was dating Cantu's sister, who lived with Cantu, their mother, and Cantu's two children.

Later during the evening on September 30, Cantu told Gutierrez she was tired of being broke and having no money.  Gutierrez told her he knew how to get some money if she was "down," or willing to go along with a plan, and she said, "Yeah, I'm down."  Next, Gutierrez told Cantu, "Well you need to give me a ride to find a gun tonight," and Cantu agreed.

Gutierrez left Cantu's house, and around two hours later, Cantu, accompanied by Lindsay Parchcorn, picked up Gutierrez and a person named "Mando" at Stefanie Macias's house.  With Cantu driving, the four of them went to the Riverside/La Sierra area, looking for a gun.

At one point, they stopped at a gas station, Gutierrez pointed to another gas station across the street and said, "That's where it's going to take place."  At the first gas station, Gutierrez took over driving for Cantu because she was falling asleep, and drove over to the second gas station.  There was a "tire or lube" business next to the second gas station.

Gutierrez stopped the car on a side street, behind and around one city block from the second gas station.  He told Cantu she was going to wait for him on the side street in the car, he "was going to come out running," and she was going to drive the car onto the 91 freeway.  To demonstrate the plan, Gutierrez drove onto the 91 freeway, got off on the next exit, turned into a Stater Bros. parking lot, and said, "we're going to come here, we're going to leave your car here, and my homeboy will be right here waiting for us."

6

Cantu later feel asleep while Gutierrez continued driving. They later returned to Corona, but they did not have a gun. At Cantu's apartment, Gutierrez dropped off Cantu, Parchcorn, and another person they picked up in La Sierra who had a methamphetamine pipe. Gutierrez told Cantu he was going out again to look for a gun because he did not yet have one.

Gutierrez later returned to Cantu's apartment, still without a gun. At that point, Cantu told Gutierrez she thought Perez had a gun, and he should ask Perez whether he could borrow Perez's gun. In response, Gutierrez said he was going to ask Perez for a gun and left Cantu's apartment.

Later during the morning of October 1, and before Cantu went to work around 7:30 a.m., Gutierrez returned to Cantu's apartment. After Gutierrez returned, Cantu saw Perez at her apartment, but she did not see Perez and Gutierrez arrive together. When Perez was at the apartment, but outside of Perez's presence, Gutierrez asked Cantu whether she had any methamphetamine to "smoke out" Perez, meaning let Perez use, in exchange for Perez allowing Gutierrez to use Perez's gun. Cantu understood Gutierrez was saying Perez had agreed to let Gutierrez use his gun, but Cantu did not hear or see Gutierrez and Perez talk about using Perez's gun.

Cantu told Gutierrez she did not have any more methamphetamine for Perez, and began to get ready for work. Before she left for work, she had another conversation with Gutierrez about the robbery, outside of Perez's presence. After Gutierrez called the gas station to see what time it opened, Cantu told him she could not help him during the

7

daytime because she worked. Gutierrez told Cantu he would find another getaway driver. Cantu understood she would receive half the money from the robbery for letting Gutierrez use her car.

Gutierrez drove Cantu to work in her car, and kept the car. At this point, Cantu had not seen a gun, but Gutierrez did not say anything more about not having a gun or needing to get a gun. Cantu returned to her apartment around noon on October 1, Gutierrez and Perez were there, and her car was in her garage. Gutierrez was "pumped up," and told Cantu words to the effect that he "just pulled up there," "asked for Oscar [Carrillo]," and "went bam, bam, bam." Gutierrez said Perez was driving.

Cantu returned to work around 1:00 p.m., and drove herself in her car. Later that evening, the police stopped Cantu while she was driving her car and arrested her. After being shown a picture of her car from a surveillance videotape and being told her car was used in a shooting, Cantu admitted giving her car to Gutierrez so he could commit a robbery.

Cantu was charged with murder, but the charge was dismissed after Cantu agreed to plead guilty to robbery and conspiracy, serve a nine-year sentence, and testify truthfully. Cantu had served her sentence and was out of custody at the time of Perez and Gutierrez's trial in October 2011.

B.     *Additional Testimony Against Perez.*

After Gutierrez took Cantu to work on the morning of October 1, he and Perez used Cantu's car to take Macias from Cantu's apartment to Macias's home in Corona.

8

Perez was driving and as they dropped off Macias, Gutierrez told her something to the effect that he was going to take care of something and would call her later. Later that day, Macias learned that a person named Oscar had been murdered.

Around 10:30 a.m. on October 1, Carrillo was shot and killed in front of the garage bay where he was working at the Lube Express on the corner of Magnolia and Pierce. A gas station was adjacent to the Lube Express building.

Witnesses saw a gray car, later identified as Cantu's car, pull in front of the garage bay where Carrillo was working, saw the passenger, later identified as Gutierrez, make a hand motion toward Carrillo to come to the car, and saw Carrillo approach the car. As Carrillo approached or was near the car, Gutierrez fired multiple bullets at him, striking him with six bullets. The driver of the car, later identified as Perez, sped away and drove onto the eastbound 91 freeway.

Around 30 minutes before Carrillo was shot, Jonathan Silva, who was working at the Lube Express with Carrillo, noticed the gray car parked in front of the gas station near the Lube Express. At that time, Gutierrez walked up to Silva and Carrillo, began talking about problems with his car, and asked for a job application. Although Carrillo said they were hiring, Gutierrez did not take an application. Instead, he continued talking about his car; the entire conversation lasted a minute or two. No threats or demands were made, and it did not appear to Silva that Carrillo and Gutierrez knew each other. Gutierrez returned to the car and drove away. No one else was in the car.

9

The car returned a second time around 20 minutes later. This time, two people were in the car; a man later identified as Perez was driving, and Gutierrez was in the front passenger seat. From the passenger seat, Gutierrez called to Carrillo, saying the car was making a noise and asking Carrillo to take a test drive with him, but Carrillo declined.

The car left and returned a third time, when the shooting occurred. Perez was still driving, Gutierrez was still in the front passenger seat, and this time two women were in the backseat. From the passenger seat, Gutierrez called to Carrillo, saying he had a part for the car. Carrillo approached the car, Silva heard gunshots, and saw Carrillo fall to the ground. No one threatened Carrillo or demanded money.

On October 23, 2003, the policed conducted a traffic stop of Perez's father in an effort to locate Perez. Perez was in the camper shell of the truck, and was taken into custody and arrested. It appeared Perez had dyed his hair with blonde streaks.

C.     *Perez's Recorded Jail Call.*

The jury heard a recording of a telephone call Perez made using a pay phone at the jail. During the call, a woman read Perez a newspaper article about the murder and arrests, and Perez became upset when he heard Cantu was cooperating with the police. Perez concluded the conversation by telling the woman, "I already told them [the police] I was there."

D.     *Stipulations.*

The parties entered into several stipulations, including that (1) both Perez and Gutierrez were members of Corona Varios Locos, a criminal street gang within the

10

meaning of section 186.22, subdivision (f), (2) on October 2, 2003, when police were conducting a stakeout of Gutierrez to arrest him for the murder of Carrillo, Gutierrez said to someone via cell phone: "That bitch don't know what I did. I'm not going out like that. Yeah, I know I'm hot. I might need to lay low for a while or skate town. I'm not going out like that. You know what I'm saying?," and (3) after Gutierrez made these statements, officers tried to arrest him, but he fled on foot, was captured, and was taken into custody.

E.     *Perez's Testimony at the Evidentiary Hearing*.

At the evidentiary hearing, Perez testified that a fellow gang member, whom he refused to name, picked him up. The plan was to "pick up dope" from a man named Oscar. Perez had no idea that his companion intended either a robbery or a shooting.

Because Perez was a gang member, he always carried a gun. It was in his waistband, but to be able to drive, he took it out and "put it down between the seats."

They went to where Oscar was supposed to be. Gutierrez asked someone there a question; the person said no; and they left. They picked up some girls, then went back. The victim came up to the car and "g[ot] shot." He was shot with Perez's gun, but Perez did not shoot him. Perez also denied giving the shooter a gun.

IV

LEGAL BACKGROUND

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) became effective on January 1, 2019. (Stats. 2018, ch. 1015.)

11

Senate Bill 1437 amended section 189 so as to restrict the scope of the felony murder rule.  (Stats. 2018, ch. 1015, § 3.)  Specifically, it amended section 189, concerning the degrees of murder, so as to provide that the felony murder rule (§ 189, subd. (a)) applies to a person only if:

"(1)  The person was the actual killer.

"(2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3)  The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ."  (§ 189, subd. (e).)[3]

Senate Bill 1437 also enacted section 1172.6 (Stats. 2018, ch. 1015, § 4), which provides:  "A person convicted of felony murder . . . may file a petition . . . to have the petitioner's murder . . . conviction vacated" if "[t]he petitioner could not presently be convicted of murder . . . ."  (§ 1172.6, subds. (a), (a)(3).)

If a petition under section 1172.6 is facially sufficient, the trial court must hold a hearing to determine whether the petition states a prima facie claim for relief.  (§ 1172.6, subd. (c); *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

If the petition does state a prima facie claim for relief, the trial court must hold an evidentiary hearing.  At the evidentiary hearing, the prosecution has the burden to prove,

---

[3]  Or — we note for completeness, although it is not relevant here — unless the victim was a police officer killed in the course of his or her duties and the defendant knew or should have known that.  (§ 189, subd. (f).)

12

beyond a reasonable doubt, that the petitioner is guilty of murder even under current law. (§ 1172.6, subd. (d)(1), (d)(3).)  If the prosecution fails to meet this burden, the trial court must grant the petition and vacate the murder conviction.  (§ 1172.6, subd. (d)(3).)

We review the trial court's finding under the substantial evidence standard. (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1109-1110, review granted, Aug. 9, 2023, S280278.)  "'Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for "'substantial evidence — that is, evidence which is reasonable, credible, and of solid value'" that would support a finding beyond a reasonable doubt.'  [Citation.]  We must 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  . . .  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.  [Citation.]  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."'  [Citation.]"  (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)

## V

## RECKLESS INDIFFERENCE

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

In 2015 and 2016, the California Supreme Court issued two opinions clarifying the meaning of "reckless indifference to human life."

First, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), the evidence showed that defendant Matthews acted as the getaway driver in a planned armed robbery, which turned into a murder when Banks shot a security guard. (*Id*. at p. 795.) The court held that this was insufficient evidence that Matthews acted with reckless indifference to life. (*Id*. at pp. 807-811.) It explained: "There was evidence from which the jury could infer

14

Matthews knew he was participating in an armed robbery.  But nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death.  There was no evidence Matthews intended to kill or . . . knowingly conspired with accomplices known to have killed before.  Instead, . . . Banks's killing . . . was apparently a spontaneous response to armed resistance from the victim." (*Id*. at p. 807.)  It held that mere knowledge that one's accomplice in a robbery is armed is not sufficient to establish reckless indifference to human life.  (*Id*. at  pp. 808-810.)  It also held that the commission of a robbery with a fellow gang member is not sufficient, absent evidence that the participants in the robbery had previously participated in the gang's violent activities.  (*Id.* at pp. 810-811.)

In 2016, in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the Supreme Court again found insufficient evidence that the defendant acted with reckless indifference to life.  (*Id*. at pp. 614-623.)  It listed five factors that are typically relevant to this inquiry.  First, "[a] defendant's use of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life." (*Id*. at p. 618.)  However, "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life. [Citation.]" (*Ibid*.)  Second, a defendant's physical presence at the scene, while not absolutely required, is relevant, as is the failure to render aid to a victim.  (*Id*. at pp. 619-620.)  Third, "[t]he duration of the interaction between victims and perpetrators" is relevant; "[c]ourts have looked to

15

whether a murder came at the end of a prolonged period of restraint of the victims by defendant." (*Id*. at pp. 620-621.)  Fourth, it is relevant that the defendant knows that an accomplice has a propensity to violence, especially lethal violence.  (*Id*. at p. 621.)  Fifth, it is relevant that the defendant took steps to minimize the risk to human life.  (*Id*. at pp. 621-622.)

After examining these factors in the case before it, the court concluded that there was "nothing in the plan . . . that elevated the risk to human life beyond those risks inherent in any armed robbery."  (*Clark*, *supra*, 63 Cal.4th at p. 623.)

Perez's participation in the attempted robbery can be readily summarized.  He provided a loaded gun — this is inferable from the fact that Gutierrez had proposed giving him drugs in exchange for a gun; that after Gutierrez said he was going to get a different getaway driver (i.e., Perez), he said no more about needing a gun; and that Perez admitted it was his gun that fired the fatal shots.[4]  Perez drove Gutierrez to Lube Express a first time, when Gutierrez tried to lure the victim into the car.  He then drove Gutierrez to Lube Express a second time, when Gutierrez shot and killed the victim.

This case is not even close.  As in *Clark*, there was "nothing in the plan . . . that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.)

---

[4]      In addition, if we were to consider the reporter's transcript (but see part II, *ante*), a gang expert testified that, if an older gang member asks a younger gang member to assist in a crime, the younger gang member must comply.  If he refused, he would be assaulted, shot, or killed.

Perez knew a loaded gun was going to be used in a robbery; however, the Supreme Court has told us this is not enough. He did not personally use the gun. The fact that he supplied the gun is relevant to whether he was a major participant, but not to whether he acted with reckless indifference. The interaction between the perpetrators and the victim was brief. There was no evidence that Perez knew that Gutierrez had a propensity to violence. As noted in footnote 3, *ante*, the People argue that Perez would have known that "Gutierrez needed to protect his reputation in the gang by *either* accomplishing the robbery *or* committing a violent act." (Italics added.) In other words, they concede that accomplishing the robbery was sufficient to secure Gutierrez's reputation. Under these circumstances, the mere fact that Perez was present at the scene does not show reckless indifference.

Finally, it is true that Perez did not take any steps to minimize the risk to human life, but it does not appear that he had much of an opportunity to do so. Again, merely supplying the weapon for an intended armed robbery is insufficient. As there is no evidence that Perez knew that Gutierrez was actually going to shoot, he had no reason or opportunity to try to prevent the shooting. At worst, he did not render aid to the victim. However, once he agreed to help a fellow gang member commit an armed robbery by acting as getaway driver, and once the fellow gang member committed murder instead, it is a bit much to expect that he would call 911 or administer first aid. Anyway, there were others on the scene who could do so. This is insufficient to demonstrate reckless indifference to human life.

The People argue that, after the first attempt, when Gutierrez attempted to lure the victim into the car, Perez brought Gutierrez around again for a second attempt, showing that "Perez was willing to take [the victim] away . . . in order for Gutierrez to commit the robbery in a more advantageous location." Not so; as the attempt to lure the victim away had failed, it would be unreasonable to suppose that Gutierrez was going to try to lure the victim away again. In any event, this means, at most, that Perez was willing to commit an armed kidnapping as well as an armed robbery. However, the foreseeable risk of death inherent in *any* violent felony is insufficient to satisfy the test. And even if it was sufficient to satisfy the objective portion of the test, it failed to show a subjective appreciation of a significant risk of death. The fact that Perez brought Gutierrez around for a second attempt shows only that he was determined to commit the robbery.

The People also argue that Perez "could have driven away when Gutierrez raised the gun to shoot at Carrillo." This is speculative. We do not know how quickly Carrillo raised the gun nor how well Perez could see that he was raising the gun. Carrillo did not have time to duck or run away; presumably Perez also did not have time to decide to step on the gas.

Finally, the People argue "Perez could have unloaded the gun before he gave it to Gutierrez to use in the robbery." Again, however, mere knowing participation in an armed robbery is insufficient.

We therefore conclude that there was insufficient evidence that Perez acted with reckless indifference to human life.

18

VI

INEFFECTIVE ASSISTANCE OF COUNSEL

Perez contends that his counsel at the evidentiary hearing rendered ineffective assistance by failing to cite evidence, by failing to raise available arguments, and by failing to ask the trial court to explain its tentative decision before putting Perez on the stand. We are reversing and remanding on other grounds. Therefore, we need not and we do not reach this contention.

VII

JUDICIAL BIAS

Perez contends that the trial court judge displayed bias. Again (see part VI, *ante*), because we are reversing on other grounds, we need not reach this contention.

Also, Perez forfeited any such claim by failing to file a prompt writ petition. An appellate court can review a claim of judicial bias only by writ, not by appeal. (Code Civ. Proc., § 170.3, subd. (d); *People v. Lucas* (2014) 60 Cal.4th 153, 304, disapproved on unrelated grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

In fairness to the trial court judge, however, we note that Perez has not shown even a hint of bias.

In explaining why it found Perez's testimony not credible, the trial court said, "I've been working both as a trial lawyer and a judge on gang cases for the better part of the last decade. I know Corona Varrio Locos [CVL] very well. And I know the code, I know you're [not] supposed to testify against your fellow gang members . . . . It makes

19

perfect sense to the Court.  I respect that.  You are following the code.  But with that said, without being completely honest and forthright or truthful with the Court, you hurt or negatively affect your own credibility."

Perez argues that the trial court (1) "relied on outside knowledge of CVL" and (2) was "biased against Perez because he stuck to the 'code' and would not snitch and name Gutierrez as the shooter . . . ."  However, it did not rely on its knowledge of CVL in any way.  It simply explained that it found Perez not credible, *despite* its knowledge of the mitigating fact that he was just "following the code."

And it was hardly bias to find that Perez was not credible.  "[A] trial judge may hear a case even if he or she has expressed an adverse impression of a party that was 'based upon actual observance of the witnesses and the evidence given during the trial of an action.'  [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 441.)  Perez placed his loyalty to his fellow gang member above his oath to tell the whole truth.  It was a reasonable inference that his testimony as a whole was not credible.

VIII

DISPOSITION

The order denying the petition is reversed.

Perez contends that, on remand, the trial court should grant the petition.  At oral argument, the People contended for the first time that the trial court should hold a new evidentiary hearing, at which they can try to prove that Perez is guilty of first or at least second degree murder as an aider and abettor acting with express or implied malice.

20

Perez objected that these theories were never presented to the jury at his trial. We called for supplemental briefing on this issue.

If the People did not have a full and fair opportunity to present an actual malice theory at the evidentiary hearing, then we should allow a new evidentiary hearing; but if they did, we should not. (See § 1260; *People v. Rodriguez* (1998) 17 Cal.4th 253, 258; *People v. Rocha* (2019) 32 Cal.App.5th 352, 357-360.) In June 2022, when the evidentiary hearing was held, there was case law allowing the prosecution to proceed on a new theory of murder that it did not raise at trial. (*People v. Flint* (2022) 75 Cal.App.5th 607, 618; *People v. Duchine* (2021) 60 Cal.App.5th 798, 813; accord, *People v. Schell* (2022) 84 Cal.App.5th 437, 444-445 [Oct. 2022].) Thus, the prosecution was on notice that it could proceed, if it chose, on an actual malice theory. However, it did not.

Moreover, as Perez argues, our holding that there was insufficient evidence of reckless indifference to human life necessarily means, a fortiori, that there was insufficient evidence of express or implied malice. Again, if the prosecution had no idea that it could present evidence of express or implied malice, it might be allowed a do-over. However, it did know (or should have known) this. Therefore, this failure of proof is conclusive.

Accordingly, on remand, the trial court must grant the petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
                              P. J.

We concur:

McKINSTER _____
                              J.

RAPHAEL _____
                              J.