Filed 6/2/25  P. v. Kinney CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063880 |
| v. | (Super. Ct. No. INF2201084) |
| LEMUEL KINNEY III, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Dean Benjamini, Judge. Affirmed.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

Lemuel Kinney III and an accomplice, Ezequiel Andres Torres, were jointly charged with kidnapping and assaulting L.E. with a firearm, as well as other offenses. Prior to trial, Torres pleaded guilty to the charges. During Kinney's jury trial, Torres testified regarding a drug deal that had gone wrong, in which he and Kinney assaulted L.E. with firearms and forcibly moved L.E. to the front door of his residence to unlock the door. The jury convicted Kinney of kidnapping, assault with a semiautomatic firearm, and possession of a firearm by a felon.

On appeal, Kinney contends Torres's accomplice testimony was uncorroborated and therefore the evidence was insufficient to support his convictions. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

TEXT MESSAGES BETWEEN TORRES AND L.E.

On February 11, 2022, 18-year-old Torres sent text messages to 17-year-old L.E. after seeing L.E.'s social media posts about selling marijuana. Torres did not know L.E. but contacted him to buy marijuana. After Torres and L.E. agreed on a price for an ounce of marijuana and some pills, L.E. gave Torres his address to come pick up the items. At L.E.'s request, Torres sent a photograph of himself. Torres sent L.E. a message when he was about five minutes away, letting him know he was close. L.E. sent a message asking Torres to get out of the car when he got there.

II.

L.E.'S STATEMENTS TO LAW ENFORCEMENT

Around 2:30 a.m., Riverside County Deputy Sheriff Manuel Padilla was dispatched to L.E.'s address. An adult living at the residence

showed Padilla video from surveillance cameras on the property and reported armed individuals tried to "take" L.E.

L.E. did not tell Padilla he had arranged to sell drugs to Torres and denied knowing who the armed males were. Instead, he told Padilla he walked outside around 11:40 p.m. to talk to his cousin on his cellphone when two males in a white, older model car called him over and tried to sell him drugs. He described one as a Hispanic male and the other as a Black male. L.E. said the Hispanic male was driving, and the Black male, who was in the car's backseat, got out when L.E. walked up to the car. The Black male wore a ski mask rolled up like a beanie and pulled it down later. The Hispanic male wore a half-ski mask that showed his nose. L.E. said each male pulled out a handgun and "clocked" them. The Hispanic male hit L.E. in the head with a handgun.

L.E. ran toward the driveway of a neighbor's house. He fell, and they searched his pockets at gunpoint, demanding L.E. give them his money. They, however, did not find anything in his pockets. They kicked L.E. in his side and threatened to kill him and his mother if he made any noise. L.E. told Padilla the two males picked him up and dragged him to his house, with the Black male holding on to L.E.'s sweatshirt and walking behind him. At some point, they had a gun to his neck. L.E. recounted one of the males demanded to know the location of the money and told him to open the door to the house or they were going to kill him and his family. L.E. prevented them from entering the house by pretending to be unable to unlock the door. L.E. jumped a wall and ran away, then the two males left.

Padilla viewed the video from the home's surveillance cameras. The recording from one camera depicted two males pushing L.E. to the residence's front door. The video recording from the front doorbell camera

3

showed the two males walking up with L.E.; the males could be heard telling L.E. to open the door and demanding he tell them the location of the money. The two males wore dark clothing and their faces were covered with ski masks. Padilla was unable to see the suspects' full faces in the video footage he reviewed. It appeared to Padilla one assailant was Hispanic and the other was Black; the Black male was holding a handgun. The Hispanic male was wearing blue medical gloves and put black gloves on over them. L.E. feigned being unable to unlock the front door.

Padilla also obtained video from a surveillance camera at a nearby residence. The neighbor's surveillance camera captured "a white older-model four-door vehicle parked near" L.E.'s residence. But the video was blurry, and Padilla could not determine the car's license plate or see distinguishing marks on the car. Padilla believed the car was a Honda.

Deputy Yadira Perez interviewed L.E. a few weeks after the incident. L.E. maintained the story he gave Padilla, with slight variations. L.E. told Perez he was by the bench across the street from his house when the Hispanic guy called him over, asked to use his cellphone, and tried to sell him marijuana, amphetamine pills, and fentanyl. L.E. said they tried to get him into the car, and when he declined, they pulled out handguns and demanded money.

L.E. recounted he ran and fell. The males were quickly on top of him, and the Hispanic male patted him down. They picked him up and threatened to kill him and his family if he made any noises. They said they wanted all the money and everything in the house. They walked him to his house with a gun on him. L.E. pretended he was unable to unlock the front door. He suggested he could hop the gate and go in through the side door.

4

They gave him a boost over the wall and L.E. ran to the back door. The two males left and drove away in their car.

L.E. told Perez the Hispanic male had a tattoo on his finger of a money bag with a money sign on it. He provided Perez a photograph of the Hispanic male as a potential suspect in the incident, which L.E. said he obtained from social media. He said the other assailant "looked [B]lack" but could have been "a dark Mexican." L.E. described the car they were driving as white with a black flame on it.

## III.

### POLICE INVESTIGATION

Law enforcement submitted the photograph L.E. provided Perez to a facial recognition database and identified the individual in the photograph as Torres. In March 2022, they executed a search warrant for Torres's residence and found two nine-millimeter Glock-style handguns, similar to those seen in the video from the surveillance cameras. One firearm was located inside a small bag belonging to Torres's cousin, and the other was discovered in the purse of Torres's girlfriend. The handgun in the purse had an extended magazine like one of the guns used in the incident. A black puffer jacket, like the one worn by the Black male during the incident, was found at Torres's residence.

Torres, his girlfriend, and his cousin were arrested. Perez interviewed Torres following his arrest. Torres admitted going to L.E.'s residence to buy drugs and the deal did not go as planned, but he did not initially name the person with him. He was hesitant to name his accomplice because he was worried something would happen if he did. Perez told Torres she could potentially have his girlfriend, who was a minor and thought to be pregnant at the time, released to her parents instead of being booked into

juvenile hall. Perez asked Torres what he was going to do for her. Torres identified Kinney as the person with him because he did not want his girlfriend to go to jail. When he identified Kinney to Perez, Torres knew Kinney had other charges pending against him.

Based on the information Torres provided, a deputy sheriff located Kinney's home and saw a car parked at the residence like the one seen in the surveillance video from the incident. The car at Kinney's residence was a four-door, white, older Toyota Camry, with several stickers on the bumper. It appeared the car had been involved in a traffic collision and was inoperable. A records check on the car's license plate indicated the car was a 1999 Toyota registered to Lemuel Kinney. Law enforcement executed a search warrant for Kinney's residence but did not locate any items relevant to their investigation.

IV.

CHARGES

The prosecution jointly charged Kinney and Torres with kidnapping L.E., assaulting him with a semiautomatic firearm, and attempted robbery.

In April 2023, Torres pleaded guilty to the charges. He also pleaded guilty in a separate case to a misdemeanor charge of possession of a loaded firearm in a public place. Torres received 3 years of probation and a 10-year suspended sentence.

Kinney proceeded to trial on an amended information that charged him with kidnapping (Pen. Code, § 207, subd. (a); count 1);[1] assault with a semiautomatic firearm (§ 245, subd. (b); count 2); attempted burglary

---

[1] Undesignated references are to the Penal Code.

6

(§§ 664, 459; count 3); and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). In the amended information, the prosecution alleged Kinney personally used a firearm in the commission of the kidnapping (§ 12022.53, subd. (b)); committed the offenses while out on bail (§ 12022.1); and was previously convicted of an offense that qualified as a prior serious felony (§ 667, subd. (a)) and a prior strike offense (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)).

During a hearing on the in limine motions, Kinney admitted the prior conviction allegations. The out-on-bail allegation was bifurcated from the substantive charges, and Kinney waived his right to a jury trial on this allegation.

## V.

### PROSECUTION'S TRIAL EVIDENCE

Prior to his testimony, L.E. was granted immunity under section 1324. L.E. was in custody at the time of his testimony, after pleading guilty in two cases to possession of a loaded firearm in a public place. L.E. testified he did not recognize the text messages between him and Torres involving the sale of marijuana and other drugs. After he denied reporting to law enforcement that two men attempted to rob him at gunpoint or that any crime occurred, the prosecution played recordings of his prior statements to Padilla and Perez.

L.E. repeatedly testified he had never seen Kinney before, did not know him, and Kinney was not involved in the incident.

Torres was also granted immunity under section 1324 for his testimony. Torres testified he met Kinney when Kinney was having work done on his car. The two men started hanging out and smoked marijuana together.

7

Torres described the events that took place on February 11, 2022 involving L.E. While Torres was messaging L.E., Kinney visited Torres. Kinney was driving his white car, a four-door Toyota sedan. Once they received L.E.'s message confirming the sale, they went to L.E.'s house in Kinney's car to purchase the drugs. When they arrived,[2] they parked the car and met L.E. by a bench across the street from the address he gave them. Torres was wearing a mask similar to a ski mask.

Torres gave cash to L.E. for the purchase. L.E. informed them he did not have the items they wanted to purchase but his friends were coming with the drugs. Torres and Kinney stood outside with L.E., by the bench, waiting for his friends to arrive. Torres and Kinney were upset L.E. was unable to produce the items he agreed to sell them. Torres thought L.E. was stalling them so L.E.'s friends could come and try to rob them. After a few minutes, Torres and Kinney started to argue with L.E. and things escalated because L.E. kept repeating his friend was coming "with the stuff." Kinney pulled out a nine-millimeter handgun, loaded the chamber, pointed it at L.E., told him to stop playing, and demanded he give them the drugs. Torres also pulled out his handgun.

L.E. ran, causing Torres and Kinney to chase after him because he had taken their money without giving them the drugs. When L.E. fell, Torres and Kinney caught up to him. They searched his pockets, trying to find money or a phone, but they were unable to find anything. They ordered L.E. to get up and assisted him by picking him up by his arms. When L.E.

_____

[2] Torres provided inconsistent testimony as to who was driving when they arrived. He initially testified Kinney was driving, but on cross-examination, Torres testified he was driving Kinney's car when they met L.E.

professed he did not have the drugs, they told him to take them to his house. As they walked L.E. to the front door of his house, they held L.E.'s arms. Torres was holding his handgun in his jacket pocket, and Kinney had his at L.E.'s back. But they did not verbally threaten L.E. or his family.

They demanded L.E. open the door, but he could not get it to unlock. L.E. said he would go in through the side door to get inside. After Torres gave him a boost to get over the wall, L.E. ran away. Torres and Kinney left in Kinney's car. Kinney dropped Torres off at home, and Kinney took both handguns. Torres did not see Kinney after the incident because Kinney was irritated about what happened and they were not talking.

Torres acknowledged the police found two firearms when they searched his house. However, he denied either gun belonged to him or that they were used during the incident. Torres testified both handguns used on February 11, 2022 belonged to Kinney.

Torres was shown photographs obtained from one of the surveillance videos and identified the white car as belonging to Kinney. Torres testified Kinney had a lot of stickers on the back of his car at the time. After viewing the doorbell camera's video, Torres identified Kinney in the video as being with him and L.E.

Watching the surveillance video, Perez saw what she believed to be a tattoo on the top of Kinney's left hand. The prosecution had Kinney display the tattoos on the backside of his hands to the jury, and the parties stipulated he had those tattoos since January 13, 2022.

Kinney was previously convicted of a felony in 2015 and was thereafter prohibited from owning, possessing, or having a firearm under his control.

## VI.

### DEFENSE'S TRIAL EVIDENCE

Kinney testified in his own defense and denied any involvement in the incident, stating he was at home with his wife the evening of the incident.

Kinney testified he met Torres once, in December 2021, at a baby shower for Kinney's wife. They spoke briefly, and Torres learned Kinney had a case pending against him, but Kinney did not tell Torres what the case was about.

As for the white car parked at his house, Kinney denied driving it in February 2022 or that it was the car seen in the video from the surveillance cameras. He testified the car belonged to his father, Lemuel Kinney II and was inoperable at the time of the crime. He explained his father rolled the car in January 2022 and had it towed to Kinney's house because his father did not have a place to park it. He testified he did not have a driver's license and did not own a car.

As a juvenile, Kinney was adjudicated for committing a burglary, and he was previously convicted as an adult of taking or driving a stolen vehicle, possessing a firearm as a prohibited person, and accessory to robbery.

## VII.

### VERDICTS AND SENTENCING

The jury convicted Kinney of kidnapping, assault with a semiautomatic firearm, and possession of a firearm by a felon. The jury found Kinney personally used a firearm in the commission of the kidnapping offense, and the court found Kinney committed the offenses while out on bail. The jury found Kinney not guilty of attempted burglary.

10

Pursuant to the "Three Strikes" law, the court sentenced Kinney to prison for a total term of 17 years 4 months, comprised of 6 years for the kidnapping conviction (low term doubled); a consecutive 10-year term for the firearm enhancement; and 16 months consecutive for the firearm possession conviction (one-third the midterm doubled). The court stayed the sentence for the assault with a firearm conviction under section 654 and stayed the punishment on the out-on-bail enhancement. The court imposed but struck the punishment (§ 1385, subd. (b)) for the prior serious felony enhancement.

Kinney timely appealed.

## DISCUSSION

Torres testified regarding Kinney's participation in the charged crimes, and the trial court instructed the jury Torres was an accomplice in those crimes as a matter of law. (CALCRIM No. 335.) Because Torres was an accomplice, section 1111[3] required his testimony be corroborated by other evidence connecting Kinney with the commission of the offenses. Kinney contends his convictions must be reversed because the only evidence connecting him to the offenses was Torres's uncorroborated accomplice testimony. We disagree.

*A. Applicable Law*

The California Supreme Court has "interpreted section 1111 to require 'evidence tending to connect defendant with the crimes "without aid or assistance from the testimony of"' the accomplice." (*People v. Perez* (2018)

---

[3] Section 1111 provides in pertinent part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

11

4 Cal.5th 421, 452.) The accomplice corroboration requirement in section 1111 "is based on the Legislature's determination that "because of the reliability questions posed by'" accomplice testimony, such testimony "'by itself is insufficient as a matter of law to support a conviction.""" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) "'Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that, "'without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime."'" (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.)

The California Supreme Court has explained: "[A]n accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony." (*Romero and Self, supra*, 62 Cal.4th at p. 36.) "'"The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." [Citations.] The evidence "need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and '"may be circumstantial or slight and entitled to little consideration when standing alone."'" (*People v. Dalton* (2019) 7 Cal.5th 166, 245; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 307–308.) Corroborating "'evidence is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the

jury that the accomplice is telling the truth.'"'" (*People v. Williams* (2013) 56 Cal.4th 630, 679.)

"'[T]he requirement that accomplice testimony be corroborated is an "'exception[]' to the substantial evidence" rule. [Citation.] It is based on the Legislature's determination that "'because of the reliability questions posed by'" accomplice testimony, such testimony "'by itself is insufficient as a matter of law to support a conviction.'"' [Citation.] For this reason, '[t]he trier of fact's determination on the issue of corroboration' is not binding on the reviewing court if the 'corroborating evidence . . . does not reasonably tend to connect the defendant with the commission of the crime.'" (*People v. Dalton, supra*, 7 Cal.5th at p. 245.)

*B. Torres's Testimony Was Sufficiently Corroborated*

Kinney contends there was no evidence identifying him as the second individual involved in the offenses against L.E. apart from Torres's testimony. We conclude Torres's testimony was corroborated by sufficient evidence to satisfy section 1111.

Independent of Torres's testimony, the jury viewed the surveillance videos and photographs of the older model, white, four-door sedan with a black or dark strip on the car's side, driven by L.E.'s assailants. The jury was able to compare these images to the photograph of the older model, white, four-door Toyota at Kinney's house and registered to Lemuel Kinney. From these images, the jury could reasonably determine the car at Kinney's house was the car at the scene of the incident with L.E.

Torres's testimony was also corroborated by the doorbell camera video, in which Torres and a dark-skinned male are heard telling L.E. they wanted money and they wanted him to open the front door. The jury was able to view the video and still images and compare Kinney's features and tattoos

13

to those seen in the video. L.E.'s initial statement to law enforcement, in which he described the second assailant as a Black male, also corroborated Torres's testimony. All of this evidence connected Kinney to the crimes against L.E. and gave the jury a reasonable basis for finding Torres's accomplice testimony credible. (See *People v. Rodriguez, supra*, 4 Cal.5th at p. 1129 ["The nonaccomplice evidence must corroborate aspects of the accomplice testimony that ""tend[ed] to connect the defendant with the crime"""].)

Kinney contends this evidence was insufficient corroboration. He asserts L.E.'s statement did not corroborate Torres's testimony because L.E. did not mention Kinney's face tattoos. Kinney also relies on L.E.'s trial testimony that Kinney was innocent and not the second individual involved in the crimes. Kinney contends the fact a white car was used in the crimes and a white car was at his residence was insufficient corroboration to connect him to the crimes because there are numerous white cars of the same make and age on California roads. He further asserts the tattoo on his hand was not corroborating evidence because it was not clear the suspect in the video had a tattoo. The jury, however, could reasonably reject these arguments and conclude otherwise after viewing the surveillance videos and photographs, hearing L.E.'s initial statements to law enforcement, and observing Kinney's features and tattoos in the courtroom. Corroborating evidence may be ""circumstantial or slight and entitled to little consideration when standing alone."" (*Romero and Self, supra*, 62 Cal.4th at p. 32.)

We therefore conclude the evidence was sufficient to corroborate Torres's testimony concerning Kinney's involvement in the crimes.

## DISPOSITION

The judgment is affirmed.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.